# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ISAIAH W. MCCOY, | § | No. 558, 2012 and 595, 2012 |
| | § | (CONSOLIDATED) |
| Defendant Below- | § | |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| | § | of the State of Delaware in and |
| v. | § | for Kent County |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1005008059A |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: December 10, 2014
Decided: January 20, 2015

Before **STRINE**, Chief Justice, **HOLLAND, RIDGELY, VALIHURA**, Justices, and **BOUCHARD**,[1] Chancellor, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Erek L. Barron, Esquire, (*argued*), Whiteford, Taylor & Preston, LLP, Bethesda, Maryland; and Herbert W. Mondros, Esquire, Margolis Edelstein, Wilmington, Delaware, Attorneys for Defendant-Below, Appellant.

John R. Williams, Esquire, Department of Justice, Dover, Delaware, Attorney for Plaintiff-Below, Appellee.

**HOLLAND**, Justice:

---

[1] Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4(a) to fill up the quorum as required.

This is a direct appeal from the convictions and death sentences of Isaiah McCoy ("McCoy"). Seven counts were submitted for the jury to decide: (1) First Degree Murder, intentionally causing the death of another person under 11 *Del. C.* § 636; (2) First Degree Murder, recklessly causing the death of another person while engaged in the commission of or the attempt to commit Robbery First Degree under 11 *Del. C.* § 636; (3) Possession of a Firearm During the Commission of a Felony (Murder First Degree) under 11 *Del. C.* § 1447(a); (4) First Degree Robbery under 11 *Del. C.* § 832(a); (5) Possession of a Firearm During Commission of a Felony (Robbery First Degree) under 11 *Del. C.* § 1447(a); (6) Second Degree Conspiracy under 11 *Del. C.* § 512; and (7) Motor Vehicle Theft under 11 *Del. C.* § 841(a). On June 29, 2012, McCoy was found guilty as to all but Count 7.

Following McCoy's two convictions for First Degree Murder, the trial court held a capital murder penalty hearing on July 3-10, 2012.[2] On July 11, the jury found the following aggravating circumstances: the defendant was previously convicted of a felony involving the use of, or threat of, force or violence upon another person; the murder was committed while engaged in the commission of a robbery; and the murder was committed while engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit Robbery in

---

[2] 11 *Del. C.* § 4209(b).

2

the First Degree. The finding of these aggravating circumstances made McCoy eligible for the death penalty under 11 *Del. C.* § 4209. The jury found by a 10-2 vote, on both Counts 1 and 2, that the aggravating circumstances outweighed the mitigating circumstances by a preponderance of the evidence. The jury recommended the death penalty.

On October 11, the trial judge found that "the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist" and sentenced McCoy to death on Counts 1 and 2; 20 years incarceration (with the first 5 years mandatory) on Counts 3, 4, and 5; and 1 year incarceration on Count 6.

### Issues on Appeal

In this appeal, McCoy alleges five grounds on which his convictions should be reversed. First, he argues that the Superior Court violated McCoy's right to a fair trial by seating a juror with significant potential bias. Second, he contends that the State's prosecutorial misconduct violated McCoy's due process rights. Third, he submits that the evidence was insufficient to sustain McCoy's convictions. Fourth, he argues that the Superior Court erroneously failed to instruct the jury on accomplice testimony before one of the State's witnesses testified, as required by *Brooks v. State.*[3] Fifth, he alleges Delaware's capital punishment process violates

---

[3] 40 A.3d 346 (Del. 2012).

the Due Process Clause and the Sixth Amendment to the United States Constitution under *Alleyne v. United States*.[4]

Under 11 *Del. C.* § 4209(g)(2)a., this Court must also automatically review every death sentence to determine whether "the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases . . . ."[5] We must also consider "[w]hether the evidence supports the jury's . . . finding of a statutory aggravating circumstance . . . ."[6]

We have concluded that the Superior Court committed reversible error when it improperly denied McCoy's right to exercise a peremptory challenge to strike a potential juror. In addition, reversible error occurred when the prosecutor improperly vouched for the credibility of a key witness for the State. We also address the pervasive unprofessional conduct of the prosecutor that permeated these proceedings and compromised McCoy's right of self-representation. Finally, we examine the other issues raised by McCoy, since there will be a new trial, and conclude that those issues are without merit.

---

[4] 133 S.Ct. 2151 (2013).
[5] 11 *Del. C.* § 4209(g)(2)a.
[6] 11 *Del. C.* § 4209(g)(2)b.

## State's Version of Events

On the evening of May 4, 2010, James Munford ("Munford") was fatally shot once in the right side of his torso. Munford's girlfriend, Rekeisha Williams ("Williams"), testified at trial that she had arranged a drug deal the previous day between Munford and McCoy. McCoy was supposed to purchase Munford's 200 ecstasy pills in exchange for $750 and two grams of crack cocaine. Munford and McCoy had never met, but Williams had known McCoy for at least several months. Williams and McCoy agreed to meet in the parking lot outside the Rodney Village Bowling Alley in Dover, Delaware. Dashaun White ("White"), who is McCoy's nephew[7] and lived in the same house as McCoy at the time, testified that McCoy invited him along on the pretext that McCoy would buy him clothing. White and Williams testified that they did not know each other before that night.

According to both White and Williams, Munford was sitting in the driver's seat and Williams was sitting in the front passenger's seat of Munford's Chevrolet Suburban when McCoy and White arrived. McCoy and White approached the rear passenger seat. McCoy entered the car, but instructed White to stay outside. After speaking with Munford for a few minutes, McCoy pulled out a revolver. At that point, Williams asked McCoy if she could leave, which he permitted.

---

[7] White and McCoy are nevertheless close in age. White was 21 at the time of trial. McCoy was 24.

There was an inconsistency between White and Williams at trial as to whether Williams asked if she could leave the vehicle, or if Munford requested that on her behalf. White testified that Munford had asked McCoy if Williams could leave. Williams testified that she had asked, and that her previous statements to police to the contrary were not truthful. Around the same time Williams left, McCoy instructed White to go to the front passenger's side of the vehicle. According to White's testimony, Munford then attempted to leave the vehicle, at which point McCoy shot him. White testified that he believed the bullet struck Munford in the back, consistent with McCoy's position in the back seat of the car.

Munford fell out of the car, but managed to run to the front of the bowling alley as McCoy continued to shoot. None of those bullets struck Munford. The medical examiner determined that Munford was only struck once, in the right side of his torso, from what appeared to be a downward trajectory. Nonetheless, the shot was fatal, and Munford died at the hospital soon after. After Munford died, Detective Donald Christie found seven $100 bills in Munford's pocket.

After Munford fled the vehicle, according to White's testimony, McCoy instructed White to drive the Suburban to an abandoned house nearby, where they wiped down the vehicle with White's shirt. They apparently did not find Williams' driver's license, which the police later found in the front side pocket of the vehicle. McCoy and White then walked to the home they shared with McCoy's

6

mother and several others. White testified that McCoy burned the clothing they wore during the shooting. The police later recovered partially burnt clothing from McCoy's backyard.

White and Williams both testified that after the shooting occurred, McCoy sent his sister, Darya White, to accompany Williams back to McCoy's home. Williams claimed to the police at one point that she had been kidnapped by McCoy, but later admitted that she went to McCoy's home with Darya willingly. Multiple witnesses corroborated Williams' testimony that she spent the next two or three days at White and McCoy's home, including McCoy's mother, sister, and White.

Williams testified that she felt threatened by McCoy, and did not eat or use the bathroom while she was a guest at his home. But McCoy's mother and Darya both testified that Williams ate, asked for cigarettes, and watched television with the family. Williams also continued to send text messages to McCoy after she left his house.

The gun used in the murder was never recovered, but Loretta Williams (no relation to Rekeisha) reported her .38 Taurus Revolver stolen shortly after the shooting. Her son, Talan Bishop ("Bishop"), testified at trial that he took the gun and several bullets from his mother, intending to protect a friend, Abdul Bumbrey. Bishop gave the gun to McCoy on May 2 because he needed someone to hold it

7

while he accompanied Bumbrey's girlfriend, who did not want the gun in the presence of her child. Bishop testified that he believed McCoy would return the gun, but that McCoy told him that he had thrown it into a bush because he saw police in the area.

It was not clear from Bishop's testimony when McCoy indicated he had disposed of the gun. Bishop initially lied to the police about what he had done with the gun. He testified at trial that he lied to give McCoy time to retrieve the gun because he believed McCoy was still planning to return it to him. Although the State's firearms expert, Carl Rone, could not say with certainty which specific gun was used to shoot Munford, he concluded that the .38 caliber bullet that killed Munford could have been fired from either a .38 or .357 firearm, including Loretta Williams' missing Taurus.

There is no dispute that after the shooting, McCoy retained possession of Munford's ecstasy pills. White testified that the pills were stored in two plastic sandwich bags in a gray lunch bag. Two other witnesses corroborated White's testimony regarding the plastic bags: McCoy's friend, Da'Janiel Smith, and McCoy's then-girlfriend Agealena Sauls. Williams also corroborated White's testimony regarding the gray lunch bag.

## *McCoy's Version of Events*

McCoy testified in his own defense that he had not been at the bowling alley at all on the night of May 4. He claims that he was at home getting ready for the evening when the shooting took place, although no witnesses corroborated his account. His theory at trial was that White and Williams had a previous sexual relationship, and had conspired for White to kill Munford and frame McCoy for the murder.

McCoy asserted at trial that on the day of the shooting, he conducted a non-violent transaction with Williams in which he paid for and received Munford's ecstasy pills. McCoy testified that Williams told him she was going to meet with White later that night, but then contacted him because she was unable to reach White and he had not appeared as promised. McCoy then sent Darya to pick up Williams because Williams was nervous about the heavy presence of police officers outside.

McCoy testified that White confessed to him that he had killed Munford. McCoy's sister, Darya White, also testified that White admitted to her that he had "bagged a body," but that he did not elaborate beyond that during their conversation.

## *Other Evidence*

There was little physical or forensic evidence to support either the prosecution or defense's theory. DNA swabs taken from Munford's vehicle did not match Munford, McCoy or White. Fingerprints lifted from the vehicle also did not match McCoy's or White's. The police never found the gun used in the shooting.

The bowling alley's motion sensitive surveillance video captured two men approaching a vehicle, one of whom walks to the front of the vehicle. The driver's side door opens and Munford exits. It appears that a struggle takes place before Munford begins running. The quality of the picture was not sufficient for the police to recognize any individual, but White identified himself as the man in the front of the vehicle, although he claimed he did not fight with Munford. The video does not capture what happens to the other man who had approached the vehicle, nor does it show Williams at any point. There are a number of gaps in the video, apparently because there had been no motion to trigger the camera.

Several independent witnesses testified for both the prosecution and defense. Yves Hall testified that he heard a gunshot as he drove past the bowling alley, then saw two men fighting in front of the Suburban. He could not confirm if there were others in the vehicle. Mary Skocik testified that she was walking near the bowling alley when she heard "four loud cracks" that she thought were fireworks.

Abraham Patz, who lives across the street from the bowling alley, also testified to hearing gunshots, and seeing a man "stumbling through the parking lot, and a large white SUV taking off at a high rate of speed out of that parking lot." He also could not determine whether there were passengers in the SUV from his vantage point.

Ella Hickman, who had been walking in the area at the time of the shooting, testified that she saw two individuals in a white SUV in the parking lot. She then saw two men approaching the vehicle, but she was "positive" that McCoy was not one of them. She also testified that the taller of the two men approaching the vehicle was wearing a black baseball cap with red letters, which she identified as the hat in evidence that had been taken from McCoy's basement by the police. She did not know McCoy before the shooting.

Johnnie Shockley, who identified himself as Munford's best friend, testified that Munford frequently sold ecstasy, and that he typically carried a .22 handgun to drug deals. The police found forty .22 caliber bullets in the car, but no handgun.

There was also testimony at trial about McCoy's phone records, which show that Williams called him multiple times immediately after the shooting, despite her claim to the police that did not contact him after leaving his house. Williams also testified that she called Munford after running away from the vehicle on the night of the shooting, but there was no evidence of this call on her phone records.

## Procedural Background

McCoy was indicted on July 6, 2010, for ten offenses, including six for which he was convicted: First Degree Murder; First Degree Murder During a First Degree Robbery; Possession of a Firearm During the Commission of a First Degree Murder; First Degree Robbery; Possession of a Firearm During the Commission of a First Degree Robbery; and Second Degree Conspiracy. The State entered a *nolle prosequi* for additional charges of Kidnapping, First Degree Conspiracy, and Theft of a Motor Vehicle. The State also severed a charge of Possession of a Firearm by a Person Prohibited.

Jury selection in McCoy's trial began on January 9, 2012, but was continued on January 23 until May 14. On the second day of jury selection in May, McCoy applied to proceed *pro se*, which the Superior Court allowed, with McCoy's former attorneys operating as standby counsel. Jury selection was completed on May 24.

The trial took place from May 29 to June 26. McCoy made a motion for acquittal at the end of the State's case. The Superior Court reserved judgment. At the close of McCoy's defense on June 25, the Superior Court denied McCoy's motion, ruling that "any rational trier of fact could find the essential elements of the crimes above beyond a reasonable doubt." After the trial ended, the jury deliberated for two days, returning a unanimous guilty verdict on six counts on June 29.

The penalty phase of the trial took place from July 3-10, 2012, during which McCoy refused to argue a mitigation case on his own behalf. McCoy made a motion for a new trial under Rule 33 on July 5, which the Superior Court denied. McCoy also renewed his motion for acquittal on July 9, which the Superior Court again denied.

On July 11, the jury unanimously found two of the statutory aggravating factors required to impose capital punishment under Delaware law: McCoy had previously been convicted of a violent felony,[8] and he had committed the murder while engaged in the commission of a robbery.[9] By a 10-2 vote, the jury found that the aggravating circumstances outweighed any mitigating circumstances, and recommended that the death sentence be imposed.

The Superior Court also weighed the evidence, including a mitigation notebook prepared by McCoy that was not shown to the jury. Ultimately, the Superior Court agreed with the jury, and sentenced McCoy to death on October 11, 2012, for the two counts of First Degree Murder; 20 years of incarceration for the possession and robbery charges; and 1 year of incarceration for the conspiracy charge.

For his part in the crime, White accepted a plea bargain from the State. In exchange for testifying against McCoy, he pled guilty to reduced charges,

---

[8] 11 *Del. C.* 4209(e)(1)i.
[9] 11 *Del. C.* 4209(e)(1)j.

including Manslaughter, for which he received an 18 year prison sentence. Williams also accepted a plea offer. She pled guilty to Second Degree Conspiracy for her role in setting up the drug deal and to hindering the prosecution for lying to the police afterward, but received only supervised probation in exchange for her testimony at trial.

### *Reverse Batson Error*

McCoy's lead argument is that the trial judge erred by *sua sponte* refusing to accept one of his peremptory challenges. McCoy argues that the trial judge violated his right to a fair trial by seating a juror with significant potential bias over his objection. In response, the State argues that McCoy's peremptory challenge was made in a racially discriminatory manner, contrary to *Batson v. Kentucky*,[10] and that the trial judge's refusal to accept McCoy's peremptory challenge was appropriately premised on a reverse *Batson* violation. In *Georgia v. McCollum*, the United States Supreme Court extended its holding in *Batson* to peremptory challenges made by criminal defendants.[11] A State's *Batson* objection to the defendant's exercise of a peremptory challenge is known as a reverse *Batson* claim.

The record reflects that when McCoy exercised a peremptory challenge to remove his eighth Caucasian juror from the panel, the prosecution made a reverse

---

[10] 476 U.S. 79 (1986).
[11] *Georgia v. McCollum*, 505 U.S. 42 (1992).

14

*Batson* challenge, asking that McCoy provide some justification for his peremptory strike. McCoy responded by stating that the juror's "son is Caucasian, he's a police officer." The trial judge then performed a *Batson* analysis, considered McCoy's past peremptory challenges and ultimately **concluded that there was no reverse *Batson* violation.** Nevertheless, the trial judge issued a warning to McCoy, telling him that he "must show that [his] challenges are non-purposeful in terms of simply seeking the removal of a prospective juror on the basis of racial classification . . . ."

Thereafter, McCoy used his next four peremptory challenges to remove Caucasian prospective jurors without objection from the State and without questions from the trial judge. When McCoy used his thirteenth peremptory challenge to strike a Caucasian male, however, the State noted that McCoy had used all thirteen peremptory strikes on Caucasian prospective jurors. The trial judge conducted a second complete *Batson* analysis and again found that a **reverse *Batson* violation did not occur.** McCoy utilized his fourteenth peremptory challenge to remove a Caucasian female whose two brothers are police officers. The State did not object and the trial judge did not ask for any explanation.

McCoy used his fifteenth peremptory challenge to remove Daniel Hanson ("Hanson"),[12] a Caucasian male. Hanson's wife had retired five years earlier as a counselor at the Smyrna Department of Corrections, where McCoy was an inmate. **The State did not object.** However, the trial judge, *sua sponte*, questioned McCoy's peremptory challenge and stated: "Mr. McCoy, I'm going to need some justification because I can't think of a reason."

McCoy responded with two justifications for his challenge. First, he explained that Hanson had paused when answering whether he could find McCoy not guilty. Second, he stated:

> [Hanson's] wife is a counselor at DCC. I'm familiar with how inmates treat these counselors at times, some of the issues that went down. As he said, about five years ago, that's around the time when the lady was raped, the counselor lady, was raped in Smyrna. So I'm pretty sure he probably heard about that. His wife probably heard about that. So the counselors get an outlook that they have and their spouses, it may trickle onto their spouses things that they may have heard and for that it doesn't sit right . . . . I know on a day-to-day basis being back at the prison how people treat these counselors and very disrespectful way, throwing things on them like feces and things of that nature. So I don't know if he's ever told her -- if she's ever told him anything about that but that just gives me a lot of pause in allowing the juror to sit on a trial while I have peremptory strikes to use, Your Honor.

---

[12] In the interest of justice, this individual has been assigned a pseudonym because he did nothing wrong and was simply discharging his civic responsibility in good faith by reporting for jury duty.

The trial judge rejected McCoy's explanations, and found that that there was "no legitimate reason why [McCoy] would exclude the juror."

The trial judge did not expressly refer to *Batson* when he refused to accept McCoy's peremptory challenge nor did he articulate a rationale for his ruling other than there was "no legitimate reason why [McCoy] would exclude the juror." If the ruling was based upon the finding of a reverse *Batson* violation, a full *Batson* analysis should have been conducted by the trial judge. Because we found an incomplete record to review what appeared to be the trial judge's attempted application of *Batson,* we remanded this case to the Superior Court for completion of the record and retained jurisdiction.[13]

When the State makes a reverse *Batson* challenge to a peremptory strike a three-step inquiry is required. First, the trial judge must determine whether the State has made a *prima facie* showing that the defendant exercised a peremptory challenge on the basis of race.[14] Second, if the showing is made, the burden shifts to the defendant to present a race-neutral explanation for striking the juror in question.[15] Although the defendant must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or

---

[13] *See Jones v. State*, 938 A.2d 626 (Del. 2007).
[14] *Batson*, 476 U.S. at 96-97.
[15] *Id.*

17

even plausible"; so long as the reason is not inherently discriminatory, it suffices.[16] Third, the trial judge must then determine whether the State has carried its burden of proving purposeful discrimination.[17] This final step involves evaluating "the persuasiveness of the justification" proffered by the [defendant], but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike,"[18] which is usually the State in a reverse *Batson* challenge.

The State did not object to McCoy's use of a peremptory challenge to strike prospective juror Hanson. Rather, the trial judge, *sua sponte*, demanded that McCoy articulate to the court's satisfaction his basis for striking Hanson.[19] Accordingly, the trial judge, rather than the State, became the opponent of the strike.

In this appeal, McCoy argues that the trial judge's demand for an explanation is "completely at odds with the very essence of a peremptory challenge," which is to permit a party or counsel to remove a juror "for any reason at all, as long as the reason is related to his view concerning the outcome of the case."[20] McCoy submits that the trial judge erred by demanding an explanation

---

[16] *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam).
[17] *Batson,* 476 U.S. at 98.
[18] *Purkett,* 514 U.S. at 768.
[19] A02151 at 177-78.
[20] *Batson,* 476 U.S. at 89 (quoting *United States v. Robinson*, 421 F. Supp. 467, 473 (D. Conn. 1976), mandamus granted *sub nom. United States v. Newman*, 549 F.2d 240 (2d Cir. 1977)).

from McCoy for exercising a peremptory challenge, in the absence of an objection from the State.

Other courts have allowed a trial judge *sua sponte* to inquire into an attorney's motives for exercising a peremptory challenge once the court observes a *prima facie* case of racial discrimination.[21] We hold that a trial judge may raise the issue of purposeful racial discrimination *sua sponte*. However, like other jurisdictions to consider this issue, we will also "insist upon a clear indication of a *prima facie* case of purposeful discrimination *before* trial courts are authorized to act."[22]

*Batson* sets forth a three-step procedure. At step one the moving party (here the trial judge) bears the burden of establishing a *prima facie* case that the non-moving party (McCoy) intentionally used his peremptory challenges to discriminate against a cognizable group. In this case, upon remand, the trial judge began his three part *Batson* analysis by summarily stating in one sentence: "With regard to the first prong, a *prima facie* showing was made that Defendant exercised a peremptory challenge on the basis of race when he attempted to strike a 15th Caucasian juror, Mr. Hanson." Although there are no fixed rules, we acknowledge that "a pattern of strikes against jurors of a particular race **could** be *prima facie*

---

[21] *State v. Mootz*, 808 N.W.2d 207 (Iowa 2012) (collecting cases).
[22] *Id.* (quoting *State v. Rivera*, 852 N.E.2d 771, 785 (Ill. 2006)).

evidence of racial discrimination."[23]  However, the Superior Court engaged in no analysis to support that conclusion.  It is the opponent of the strike's burden to set forth "facts and other relevant circumstances" to support an inference of discrimination.[24]

The record reflects that the State made its first reverse *Batson* objection when McCoy executed his eighth peremptory challenge against a Caucasian prospective juror.  The trial judge conducted a complete three step *Batson* analysis and found **no reverse *Batson* violation**, but nevertheless warned McCoy about his exercise of future peremptory challenges.  McCoy then used his next four peremptory challenges to strike Caucasian prospective jurors without any objection from the State or comment by the trial judge.  When the State objected to McCoy's thirteenth strike of a Caucasian prospective juror, the trial judge conducted a *Batson* analysis and again found **no reverse *Batson* violation**.  Neither the State nor the trial judge commented when McCoy used his fourteenth peremptory challenge to strike a Caucasian juror with two brothers who were police officers.

The trial judge's *ipso facto* finding of a *prima facie* case of racial discrimination when a fifteenth Caucasian juror was challenged by McCoy is inconsistent with his specific prior findings of no reverse *Batson* violation during the exercise of McCoy's first fourteen peremptory challenges, especially after

---

[23] *Id.* (emphasis added).
[24] *Batson*, 476 U.S. at 96-98.

carefully considering the merits and rejecting the only two peremptory strikes (eight and thirteen) that were even questioned by the State.

The quintessential reverse *Batson* claim involves the prosecution arguing that a minority defendant is engaging in racial discrimination because he is striking white jurors. Putting aside what may be distinctive reasons why any defendant would prefer a jury as much like himself as possible, there is another contextual difference from this situation and the typical *Batson* challenge. Precisely because African Americans like McCoy are members of a minority group, the pattern of his peremptory strikes against only Caucasian members of the venire may provide less of an inference for reasons of simple math. If a super-majority of the venire is Caucasian, a pattern of striking white jurors is less telling evidence in itself that race was a factor, because the mathematical odds would be that most potential jurors questioned for the parties to strike would be Caucasian in the first instance. By way of example, we take judicial notice that 68.5 percent of Kent County's population is Caucasian; only 25.1 percent is African American.[25]

The fact that McCoy struck 14 white jurors before the Superior Court denied his strike against Hanson does not provide us with sufficient context to determine

---

[25] U.S. Census Bureau, State & County Quick Facts, *available at* http://quickfacts.consus.gov/qfd/states/10/10001.htm (last visited Jan. 15, 2015).

whether there was a discriminatory pattern.[26] Although the jury ended up with five black jurors, suggesting that there were a number of black jurors in the venire, because of the importance of a defendant's right to be tried by a jury of his peers, trial courts should be cautious to inhibit the use of peremptory strikes by a defendant except after a careful application of *Batson*. That is especially true in a situation where, as here, the defendant's stated basis for the strike might well be found by a trial court to constitute grounds for excusal for cause.

After summarily finding that a *prima* facie case of impermissible discrimination had been established, the trial judge proceeded to the second step in the *Batson* analysis. Upon remand, the trial judge found that McCoy articulated a "non-discriminatory" reason for attempting to remove Hanson from the jury. If a race-neutral explanation is provided, the burden shifts back, at step three, to the opponent of the strike to make a record that would support a finding of pretext based upon all of the facts and circumstances presented.[27]

Turning to the third and final step of the *Batson* analysis upon remand, the trial judge acknowledged that he had "to determine if [McCoy's] reasoning was mere pretext for a discriminatory purpose." In deciding whether there was

---

[26] *See Jones* 938 A.2d at 632 ("In determining whether a defendant has made a *prima facie* showing of discriminatory intent, statistics are relevant.").
[27] *Purkett*, 514 U.S. at 768.

purposeful discrimination and a reverse *Batson* violation by McCoy, the trial judge on remand wrote:

> In so evaluating, this Court took into account the preceding peremptory challenges of all Caucasian jurors, as well as the Defendant's **weak reasoning** for striking Mr. Hanson. It is here that the Court took into account the behavior of the Defendant as well as his previously stated discriminatory reasons for racial preference. Defendant smirking at the prosecutor during peremptory challenges illuminated Defendant's duplicity. Defendant's peremptory strike of Mr. Hanson was nothing other than an attempt to remove an acceptable juror because of a racial classification that was not yet verbalized.[28]

The trial judge's *sua sponte* demand for an explanation from McCoy for striking juror Hanson and his refusal to accept that admittedly race-neutral explanation, must be viewed in the context of the entire record and "all of the circumstances that bear upon the issue of racial animosity."[29] We conclude that there is no record support for the trial judge's finding of pretext.

The record reflects that McCoy's peremptory challenge to juror Hanson was consistent with his prior counsel's pattern of challenging jurors with potentially biased connections. In fact, when McCoy was represented by counsel, the trial judge **struck *for cause* four jurors because their relatives worked at the correctional facility where McCoy resides**: (1) a juror struck for cause because

---

[28] Emphasis added.
[29] *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

her brother-in-law is a correctional officer; (2) a juror struck for cause because his son-in-law is a correctional officer; (3) a juror struck for cause because her husband is a correctional officer; (4) a juror struck for cause because her husband is a correctional officer and McCoy believed he knew the juror's husband.[30] In addition, McCoy's prior counsel used a *peremptory challenge* to strike a juror who had no connection to the Smyrna facility but had a relative that was a *retired* correctional officer in New Jersey.[31] Unlike the *pro se* McCoy, however, his prior counsel never received any demands for an explanation from the State or the trial judge for exercising that peremptory challenge.

Thus, the record reflects that throughout *voir dire* both the trial judge and the State repeatedly acknowledged that a juror who is related to a corrections employee at the Smyrna facility where McCoy was housed may be excused *for cause*. The trial judge struck four such jurors when McCoy was represented by counsel. The trial judge also made a point of checking with counsel, to make certain that it was okay with McCoy, when the *very first juror seated was a white male* who had an uncle who worked in corrections at the Smyrna facility. Later, when McCoy was acting *pro se*, his standby counsel advised him on the record not to seat a juror whose wife retired from the Smyrna facility. The State even argued,

---

[30] *See* A00053-54 at 124-26; A00056 at 133-36; A00067 at 179-80; and A00182-83 at 59-63.
[31] *See* A00060-66.

24

when it wanted to challenge a juror *for cause*, that it strains credulity that a juror whose uncle was a *retired* prison guard would have no biases:

> "Her uncle's a *retired* guard, but she professes no bias. I think that answer strains credulity."[32]

In view of this statement, it is not surprising that the State had no objection when McCoy used his fifteenth peremptory challenge to strike Hanson.

In the foregoing circumstances, *for cause* strikes were obvious and allowed if made or a peremptory challenge was permitted without question. Nevertheless, the same reasoning was characterized by the trial judge as "weak" when McCoy *pro se* used a *peremptory challenge* to strike Hanson. That characterization is contradicted by the record. Accordingly, we hold that the trial judge's finding of pretext and the denial of McCoy's properly exercised peremptory challenge to Hanson, a juror whose wife was a retired counselor from the Smyrna facility, was clearly erroneous because it was internally inconsistent[33] – after striking *for cause* other jurors that had connections to employees at the Smyrna facility, allowing McCoy's prior counsel to exercise a peremptory challenge to a juror because the juror was related to a *retired* correctional officer in New Jersey, and not questioning the State's earlier argument that the relative of a *retired* prison guard should be excused for cause on the basis of bias.

---

[32] *See* A00270 at 53; A00275 at 72 (emphasis added).

[33] *Banther v. State*, 823 A.2d 467, 483 (Del. 2003) (internal inconsistency is one of three general ways in which a factual finding based upon credibility could be clearly erroneous).

25

Although appellate courts must give deference to a trial judge's step three finding of pretext in a reverse *Batson* analysis,[34] there is no record support for the trial judge's rejection of McCoy's race-neutral reasons for striking Hanson.[35] The question now becomes what is the remedy when the right to exercise a peremptory challenge is improperly denied?

### Remedy Is New Trial

"'There is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges,' . . . nonetheless the challenge is 'one of the most important of the rights secured to be accused . . . .'"[36] It was used by the Romans in criminal cases.[37] "The tradition of peremptory challenges . . . was already venerable at the time of Blackstone, was reflected in a federal statute enacted by the same Congress that proposed the Bill of Rights, was recognized in an opinion by Justice Story to be part of the common law of the United States, and has endured through two centuries in all the States."[38] Peremptory challenges ensure the jury that hears the case is acceptable to the

---

[34] *See Barrow v. State*, 749 A.2d 1230, 1239 (Del. 2000).

[35] *Accord State v. Hecker*, 942 N.E.2d 248 (N.Y. 2010).

[36] *Swain v. Alabama*, 380 U.S. 202, 219 (1965) (internal citations omitted).

[37] *See* J. PETTINGAL, AN ENQUIRY INTO THE USE AND PRACTICE OF JURIES AMONG THE GREEKS AND ROMANS, 115, 135 (1769).

[38] *Holland v. Illinois*, 493 U.S. 474, 481 (1990) (internal citations omitted). For a complete list of the number of peremptory challenges in each state to each side in different types of criminal cases, see D. ROTTMAN & S. STRICKLAND, STATE COURT ORGANIZATION 2004, 233-37 (Aug. 2006) (state-by-state listing).

parties involved and preserve "'the role of litigants in determining the jury's composition . . . .'"[39]

In *Rivera v. Illinois*[40] the United States Supreme Court reaffirmed there is no federal Constitutional right to peremptory challenges. Accordingly, when states provide for peremptory challenges, as all states do, they "confer a benefit 'beyond the minimum requirements of fair jury selection' [in the United States Constitution] and thus retain discretion to design and implement their own systems."[41] Consequently, in *Rivera*, the Supreme Court held that an erroneous ruling on a reverse *Batson* challenge is not a structural error requiring automatic reversal under the United States Constitution, but left it for the states to decide whether the "mistaken denial of a peremptory challenge is reversible error *per se*."[42]

Following *Rivera*, the majority of states have continued to apply an automatic reversal rule on the basis of state law.[43] In *Commonwealth v. Hampton*, for example, the Supreme Judicial Court of Massachusetts stated: Given the importance of peremptory challenges in state jurisprudence, "[w]e continue to adhere to the view that, for purposes of State law, the erroneous denial of a

---

[39] *See McCollum*, 505 U.S. at 57 (quoting *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 630 (1991)).
[40] 556 U.S. 148 (2009).
[41] *Id.* (citations omitted) (quoting *Frazer v. United States*, 335 U.S. 497, 506 (1948)).
[42] *Id.* at 162.
[43] *Mootz*, 808 N.W.2d at 220; *Hecker*, 942 N.E.2d at 272; *Commonwealth v. Hampton*, 928 N.E.2d 917, 927 (Mass. 2010).

peremptory challenge requires automatic reversal."[44]  Delaware law is consistent with the holdings by the majority of the highest courts in other states.[45]

A defendant's "fundamental right to trial by an impartial jury," is secured by both the Sixth Amendment to the United States Constitution and Article I, Section 4 of the Delaware Constitution.[46]  However, the right to a trial by jury in the Delaware Constitution is not phrased identically to its corollary in the original federal Constitution or the federal Bill of Rights.[47]  Article I, Section 4 of the Delaware Constitution provides that "[t]rial by jury shall be as heretofore."  This language has appeared in Article I, Section 4 of three successive Delaware constitutions – 1792, 1831 and 1897.

In *Claudio v. State*, this Court reviewed the history and origin of the right to trial by jury in the Delaware Constitution, vis-à-vis the history and origins of that right in the United States Constitution.  We concluded that the differences in phraseology between the Delaware and the federal right to trial by jury are not merely stylistic.[48]  "There is, in fact, a significant substantive difference in the right to trial by jury, as it has been preserved for Delaware's citizens."[49]

---

[44] *Hampton*, 928 N.E.2d at 927.
[45] *See, e.g., Mootz*, 808 N.W.2d 207; *Hecker*, 942 N.E.2d 248; *Hampton*, 928 N.E.2d 917.
[46] *Knox v. State*, 29 A.3d 217, 223-24 (Del. 2011).
[47] DEL. CONST. art. I, §§ 4 & 7; U.S. CONST. art. III and amend. 6.
[48] *Claudio v. State*, 585 A.2d 1278, 1290 (Del. 1991).
[49] *Id.*

In *Claudio*, this Court held that the history of the right to trial by jury "as heretofore," which has remained unchanged in the Delaware Constitution since 1792, demonstrates an unambiguous intention to equate Delaware's constitutional right to trial by jury with the common law characteristics of that right.[50] Consequently, in *Claudio*, we held that *all* of the fundamental features of the jury system, as they existed at common law, have been preserved for Delaware's citizens.[51] Therefore, the proper focus of any analysis of the right to trial by jury, as it is guaranteed in the Delaware Constitution, requires an examination of the common law.[52]

At common law the peremptory challenge was considered to be a necessary part of the right to trial by jury.[53] In *Swain*, the Supreme Court traced the common law development of the peremptory challenge from the early days of the jury trial in England.[54] The right to exercise peremptory challenges by both the prosecution and the defense was the settled common law of England and incorporated by reference in Article 25 when the 1776 Delaware Constitution was adopted. The right to trial by jury was protected by Sections 13 and 14 in the 1776 Delaware Declaration of Rights.

---

[50] *Id.* at 1290-98.
[51] *Id.*
[52] *Id.*; *Swain*, 380 U.S. at 219.
[53] *Swain*, 380 U.S. at 219.
[54] *Id.* at 212-13.

However, this Court has recognized the validity of *implementing procedures* which improve the operation of the jury system, as it existed at common law, *without* changing the fundamental common law features of right to trial by jury.[55] For example, in *Claudio* we held that the present procedure in the Superior Court's Criminal Rule 24(c), which provides for the simultaneous selection of regular and alternate jurors and allows alternate jurors to be substituted *prior* to the commencement of the jury's deliberations, is the functional equivalent of the common law system.[56]

Similarly, today we recognize that the functional equivalent of the common law right to exercise peremptory challenges that has been preserved in the Delaware Constitutional right to a trial by jury "as heretofore" is implemented by Rule 24(b) of the Superior Court Rules of Criminal Procedure, which provides in relevant part, as follows: "In capital cases, the state **shall** be entitled to 12 peremptory challenges and the defendant or defendants **shall** be entitled to a total of 20 peremptory challenges. In noncapital cases, the state shall be entitled to 6 peremptory challenges and the defendant or defendants shall be entitled to a total of 6 peremptory challenges."[57]

---

[55] *Claudio*, 585 A.2d at 1290-98; *Ruffin v. State*, 123 A.2d 461 (Del. 1956).
[56] *Claudio,* 585 A.2d at 1298-1306.
[57] DEL. SUPER. CT. R. CRIM. P. 24(b) (emphasis added).

An essential element of a defendant's Delaware Constitutional right to a fair trial is for the jury panel to be comprised of impartial or indifferent jurors.[58] That right is violated "if only one juror is improperly influenced."[59] This Court has explained that:

> Juror impartiality must be maintained not only in the interest of fairness to the accused, but also to assure the overall integrity of the judicial process. Furthermore, "jury bias, either actual or apparent, undermines society's confidence in its judicial system.[60]

This Court has stated that "'[o]ne of the primary safeguards for impaneling a fair and impartial jury is a defendant's right to challenge prospective jurors, either peremptorily or for cause.'"[61] This Court has overturned convictions where the *voir dire* process prevented the use of peremptory strikes. For example, in *Schwan v. State*, the Court reversed the defendant's conviction, in part, because information concerning a seated juror's connection to the Attorney General's Office – the juror was a child care center director where the trial prosecutor's colleague took her children – did not come to light until after jeopardy had attached and the defendant had been deprived of his "historically important peremptory challenge right to remove [the] juror without showing cause."[62] In *Knox v. State*, this Court reversed

---

[58] *Banther*, 823 A.2d at 481.
[59] *Schwan v. State*, 65 A.3d 582, 587 (Del. 2013) (quoting *Hall v. State*, 12 A.3d 1123, 1127 (Del. 2010)).
[60] *Id.* at 588 (quoting in part *Knox*, 29 A.3d at 223).
[61] *Id.* (quoting *Banther*, 823 A.3d at 482).
[62] *Id.*

31

a conviction where it was not known until after trial that a juror was a victim in a pending case involving the same prosecutor.[63] The Court stated:

> Because the trial judge failed to ask the venire members whether they were victims of a crime, Knox did not have a chance to probe Juror No. 8's potential bias during *voir dire*. Even if the trial judge had questioned Juror No. 8 and determined that Juror No. 8 could serve, any rational defense counsel would be alerted to exercise a peremptory challenge to strike Juror No. 8.[64]

In *Riley v. State*, this Court held that "peremptory challenges, when appropriately executed, are an essential tool for eliminating potential jury bias **and must** be available to any party, within constitutional limits."[65] The improper denial of a peremptory challenge forces the defendant to be judged by a jury that includes a juror that is objectionable to him.[66] When this occurs, and the defendant properly objected to seating the juror by attempting to exercise his Rule 24(c) right to use a peremptory challenge[67], and that objection is overruled by an erroneous finding of a reverse *Batson* violation, prejudice must be presumed.[68] Therefore, we hold that a new trial is required when a juror is erroneously allowed to remain on the jury despite the defendant's valid peremptory challenge to that juror's presence.

---

[63] *Knox*, 29 A.3d at 223-24.
[64] *Id.* at 224.
[65] *Riley v. State*, 496 A.2d 997, 1012 (Del. 1985) (emphasis added).
[66] *Mootz*, 808 N.W.2d at 225.
[67] DEL. SUPER. CT. R. CRIM. P. 24(c); DEL. CONST. art. I § 4.
[68] *Mootz*, 808 N.W. 2d at 224-26.

Any other conclusion would leave McCoy without a remedy for the erroneous denial of his right to exercise a peremptory challenge. Almost two centuries ago, in *Marbury v. Madison*, Chief Justice Marshall, relying on Blackstone's Commentaries, stated: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."[69] In *Dorsey v. State*,[70] this Court reached that same conclusion as a matter of Delaware law. Accordingly, we hold that McCoy's death sentences must be vacated and his guilt or innocence determined at a new trial.

### Vouching By Prosecutor

McCoy's next argument on appeal is that his due process rights were violated by prosecutorial misconduct. This section of our opinion addresses the two statements made in front of the jury during the guilt phase of the trial. The first statement involved vouching by the prosecutor with respect to one of the State's two key witnesses. The second statement was an inappropriate comment but does not rise to the level of prosecutorial misconduct.

The prosecutor's vouching statement occurred in the middle of his objection during McCoy's cross-examination of one of the key witnesses, Rekeisha

---

[69] *Marbury v. Madison*, 5 U.S. 137, 163 (1803).
[70] *Dorsey v. State*, 761 A.2d 807, 821 (Del. 2000).

33

Williams, the girlfriend of the victim, James Munford. For context, the immediately preceding exchange was as follows:

> Q. Did you ever speak to him [*i.e.*, Dashaun White, an accomplice of McCoy]?
>
> A. No.
>
> Q. If I told you that Dashaun White—
>
> [Prosecutor]: Objection, Your Honor. He's trying to introduce information that is not in evidence at this point.
>
> The Court: Objection sustained.
>
> The Defendant: Okay.
>
> Q. Did you know – did you know from personal knowledge, did you know that Dashaun White spoke to you –
>
> [Prosecutor]: Objection, Your Honor. Again, this witness has testified she didn't even know the guy. She hasn't seen him. She didn't talk to him. **She obviously hasn't spoken to the defendant since he shot her boyfriend**. How would she know anything about Deshaun White; what he said to anybody?

This vouching statement came up in an unusual way—during a speaking objection by the prosecutor, as quoted above. It was not specifically objected to by McCoy at that time. Instead, he subsequently objected to the prosecutor's comment, twice, outside the presence of the jury.

The first time, the following exchange ensued:

> The Defendant: [D]uring his objection [prosecutor] made a comment about Ms. Williams not having spoken to me since I shot and killed James Munford; and that is completely inappropriate to say in front of the jury.

34

. . . [(a digression on a related topic—whether speaking objections are permitted).]

The Defendant: Your Honor, my major issue is not that. <u>My major issue is that, on objection, [prosecutor] stood up, pointed towards my direction and said: That's because she hasn't seen the defendant since he shot and killed James Munford; and I think that is inappropriate</u>.

The Court: Well, <u>I didn't hear it</u>. I am not going to – I don't know whether the court reporter took it down or not; but I did not hear it. But <u>if that was made, it is inappropriate; and [prosecutor] should not make that statement if he said that</u>.

The second time, again outside the presence of the jury, McCoy expanded on his objection, leading to the following exchange:

The Defendant: Your Honor, I would also – at this time, <u>there is still the issue of the comments [prosecutor] made earlier to the jury</u>.

[Prosecutor]: That is not an issue. That has been addressed –

The Defendant: It has not been addressed because Your Honor did not pull it up.

I asked my standby counsel to go to the court reporter to see if she can pull it up. She has been able to pull it up and give you word for word what [prosecutor] said; it was clearly improper. <u>And I believe that not only – for him to be admonished but, also, for there to be an instruction given to the jury concerning his words which were personal opinion</u>.

[Prosecutor]: It was not personal opinion. It was basically reiterating the testimony of Rekeisha Williams.

The Defendant: He said Isaiah McCoy shot and killed James Munford –

[Prosecutor]: Which is what Rekeisha Williams testified to.

The Court: Are you sure he wasn't repeating what she said – let me put a stop to this. Can you find whatever Mr. McCoy is referring to quickly for me?

(The record was read, as requested.)

. . . [(discussion whether jury was present earlier; it was)]

The Defendant: Your Honor, the problem with this is that the objection was only to Dashaun White – whether or not she spoke to him. Rather than objecting to that and stating the reason, he injected into the conversation that – when the defendant killed her boyfriend, which had nothing to do with –

The Court: You will also recall, Mr. McCoy – I will cut this off because we have a jury waiting for us. We don't want to irritate the jury; it hurts both sides.

Let's cut this off. <u>I have said several times – I have given several admonitions to the jury.</u> I have told them – <u>I said whatever you say that is not a question</u> – to the jury – <u>you are to ignore as evidence. So I think I've rectified the issue already with the jury several times as a matter of fact. So your objection stands</u>, that is it.

<u>We're not going to give any more admonitions at this stage</u> from what I understand. That's it. I have ruled.

As these excerpts show, although the vouching statement was not objected to in real time, McCoy subsequently raised this issue twice.

The record reflects that the prosecutor's statement was a complete *non sequitur*. McCoy was in the middle of cross-examining Williams about her conversations with White, and the prosecutor interjected a statement that Williams had not talked to McCoy (the defendant) since McCoy (he) shot Munford (Williams' boyfriend).

36

At first, the statement appears to have been an error in transcription because it makes no sense why the prosecutor would say that. The antecedent for "he" in the statement is unclear, given that Williams was just testifying about her communications with White. Conversely, "the defendant" unambiguously refers to McCoy. As McCoy's subsequent objections make clear, however, the "he" referred to McCoy. According to McCoy, the prosecutor **pointed in his direction while making the statement**.

"Improper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness has testified truthfully."[71]

> The prosecutor plays a special role in the adversarial system that is not limited to representing the State but also includes the responsibility as a minister of justice. This responsibility demands that the prosecutor avoid improper suggestions, insinuations, and assertions of personal knowledge in order to ensure that guilt is decided only on the basis of sufficient evidence.[72]

In *Brokenbrough v. State*, we cited to the Delaware Rules of Professional Conduct and the ABA Standards relating to the Prosecution and Defense Functions in denouncing prosecutorial vouching.[73] Rule 3.4(e) of the Delaware Rules of Professional Conduct prohibits an attorney at trial from asserting "personal

---

[71] *White v. State*, 816 A.2d 776, 779 (Del. 2003).
[72] *Kirkley v. State*, 41 A.3d 372, 376-77 (Del. 2012) (citing *Trump v. State*, 753 A.2d 963, 968 (Del. 2000)).
[73] *Brokenbrough v. State*, 522 A.2d 851, 859 (Del. 1987).

knowledge of facts in issue except when testifying as a witness, or stat[ing] a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused . . . ."[74]

In *Whittle v. State*, we held that "[t]he prosecutor . . . undoubtedly improperly vouched for the credibility of certain witnesses when he repeatedly asserted that various key witnesses were 'right.'"[75] In *Kirkley v. State*, this Court found the prosecutor's closing statement that "[t]he State of Delaware is bringing this charge because it is exactly what [the defendant] did" to be improper vouching and reversed a jury verdict against the defendant.[76] We reasoned that "[w]hen a prosecutor implies that the State only bring claims when the defendant did what the indictment charges, the prosecutor vouches for the State's case"[77] because such an assertion is "an improper inference that cannot be drawn from the evidence."[78]

In McCoy's case, the prosecutor improperly vouched for Williams' testimony by expressing his personal opinion that McCoy was guilty. Unlike in *Whittle*, the prosecutor never explicitly referred to or endorsed the veracity of

[74] DEL. RULES OF PROF'L. CONDUCT R. 3.4(e). Section 5.8(b) of the ABA Standards relating to the Prosecution and Defense Functions (Approved Draft, 1971) similarly states: "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."

[75] *Whittle v. State*, 77 A.3d 239, 246 (Del. 2013).

[76] *Kirkley*, 41 A.3d at 375.

[77] *Id.* at 377.

[78] *Id.* at 378. We addressed a similar instance of improper vouching in *Hardy v. State*, 962 A.2d 244, 247 (Del. 2008). In *Hardy*, the prosecutor vouched for the State's case by commenting that falsely reported rapes do not go to trial. We held that this assertion "dramatically jeopardized the fairness and the integrity of the trial, because that statement eviscerated the presumption of Hardy's innocence by inferring guilt from the mere fact the State chose to prosecute him." *Id.*

Williams' testimony, but instead gave his personal opinion that McCoy had shot Munford. Similar to the statement made in *Kirkley*, the comment made here implied that the prosecutor had superior knowledge unavailable to the jury. By giving his own opinion on the guilt of McCoy, the prosecutor implicitly and inappropriately corroborated Williams' testimony and endorsed her credibility. As such, the prosecutor's objection constituted improper vouching of Williams' testimony and thus prosecutorial misconduct under this Court's reasoning in *Brokenbrough*.

To determine whether prosecutorial misconduct prejudicially affects a defendant's substantial rights, we apply the three factor-test set out in *Hughes v. State*.[79] The three factors are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error.[80] The factors in the *Hughes* test are not conjunctive and do not have the same impact in every case; for example, one factor may outweigh the other two.

Having established that the prosecutor's comment was improper, we must determine, using a harmless error standard of review, whether it prejudiced McCoy by applying the factors set forth in *Hughes*. First, the record reflects that this was a close case, premised primarily on accomplice testimony. There was no physical evidence linking McCoy to Munford's murder, and thus the credibility of the

---

[79] *Hughes v. State*, 437 A.2d 559 (Del. 1981).
[80] *Id.* at 571.

State's witnesses was a crucial aspect to its case. Second, the improper comment made by the prosecutor went directly to the primary issue of the case, the guilt of McCoy. Finally, the trial court failed to remedy the situation by providing a curative instruction or mitigate any impropriety the comment may have caused by addressing it at all. This fact is especially relevant as "a jury is likely to give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding presumably available to the office."[81]

As part of our calculus, we also take into account the insulting and disruptive conduct of the prosecutor throughout the trial, as discussed below. Although most of this misconduct occurred outside the jury's presence, the conduct set a tone for the trial that was disturbing and unacceptable and increased the potential that the jury would decide the case by discounting the defendant's version of events for inappropriate reasons, a factor made even more important given the centrality of witness credibility in this case. That conduct also was of a nature calculated to hamper McCoy's ability to present his defense effectively, another relevant factor in persuading this Court that we cannot conclude this instance of vouching can be deemed harmless. Accordingly, application of the

---

[81] *Whittle*, 77 A.3d at 246 (internal quotations omitted).

*Hughes* test establishes the prosecutor's vouching prejudicially affected McCoy's substantial rights to a fair trial and requires the reversal of McCoy's convictions.

The second statement before the jury that McCoy challenges occurred on June 20, 2012, during the State's cross-examination of a witness called in the defense's case. McCoy objected to the questioning, and the following colloquy ensued:

> The Defendant: Your Honor, this is turning into another direct for the State; that's what this is turning into, Your Honor. I have an issue with that because this is my case-in-chief and they are conducting it as if it is their direct.
>
> [Prosecutor]: <u>That's what happens when you call a State's witness</u>.
>
> The Court: Just a minute. There is no need to talk about that.
>
> There is nothing before the court in terms of an objection that can be raised right now. Right now the State is proceeding in a manner which the Court will allow.

The prosecutor's statement "That's what happens when you call a State's witness" was inappropriate, but it does not rise to the level of prosecutorial misconduct.

### Unprofessional Conduct

McCoy also argues that professional misconduct by the prosecutor throughout the trial requires a reversal of his convictions. We have previously emphasized that the prosecutor "represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with

41

earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial."[82]

"The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants."[83] Beyond the general expectations for all Delaware attorneys, a prosecutor has "special responsibilities" as "a minister of justice and not simply . . . an advocate."[84] "This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."[85]

The prosecutor's conduct during McCoy's trial frequently did not comport with these fundamental professional requirements. At one point, the judge reprimanded the prosecutor for creating an improper tone at trial: "I don't appreciate your making frivolous statements in my view or matters which should be taken seriously. I don't like the cynicism that's being generated. I don't like the facial expressions that you make sometimes." Although the jury did not hear most of the prosecution's improper comments, the jury was present for several instances of unprofessional behavior.

---

[82] *Hooks v. State*, 416 A.2d 189, 204 (Del. 1980) (citing *Bennett v. State*, 164 A.2d 442, 446 (Del. 1960)).

[83] DEL. LAWYERS' RULES OF PROF'L. CONDUCT R. 3.5(d), CMT. [4].

[84] DEL. LAWYERS' RULES OF PROF'L. CONDUCT R. 3.8, CMT [1].

[85] *Id.*

After McCoy asserted in his own testimony that the prosecutor was misstating a prior witness, the prosecutor said, "It is the jury's recollection that counts," which prompted the Superior Court to remind the prosecutor that such commentary was inappropriate. During cross-examination, McCoy also objected, from the stand, when the prosecutor contended that the time of the shooting was known because "[t]here's been testimony and the surveillance speaks for itself." The objection was sustained. The prosecutor later asked why McCoy felt nervous about the police presence: "Even if you're innocent?" The judge instructed the jury to disregard this comment.

The following day, the prosecutor's re-cross examination of McCoy consisted only of "You had all night to think that up? . . . All night to think about how to respond and rehabilitate your answers from yesterday, didn't you?" The trial judge did not caution the jury that this commentary was inappropriate, even though we have warned about the possibility for juries to "give undue weight to questions that prosecutors ask that imply facts not in evidence[,]"[86] *i.e.*, that McCoy had fabricated his testimony overnight. Later in the trial, after McCoy asked questions of a witness on redirect, the prosecutor noted that McCoy's questions "certainly didn't prompt any other questions," which the judge also asked the jury to disregard.

---

[86] *Baker v. State*, 906 A.2d 139, 152 (Del. 2006).

Rather than ensure that justice be done, in accordance with the duties of a "minister of justice," the prosecutor in this case seemed to work to prevent McCoy from defending himself properly. When McCoy initially made a motion to represent himself, the prosecution tried to prevent McCoy's counsel from arguing that a "cool down" period was needed:

> Your Honor, the defendant has now had two chances to address the Court. On both occasions, he's indicated his desire to proceed *pro se*. He's obviously thought this matter over for a while, and he's reached a point where he's dissatisfied with the representation that he's receiving. He has that right. The only thing that should be done now, quite frankly, under the law is the colloquy . . . . [D]efense counsel's position with regards to an application to proceed *pro se* is not an issue to be considered at all by the Court, quite frankly.

During the trial, the prosecutor frequently objected to any attempt by the judge, or McCoy's former attorneys, whom the judge appointed as standby counsel, to assist in any way. At the beginning of the trial, McCoy was speaking with the judge about the appropriate way to question Williams without opening the door to information about his gang affiliation. The prosecutor interrupted McCoy midsentence: "Your Honor, I think I have to cut the defendant off from speaking because he's getting into the specifics of each statement may be inconsistencies [*sic*] and he's leading towards asking the question of the Court, 'How does he handle it.'"

A few minutes later, the prosecutor objected after McCoy mentioned that his standby counsel had advised him to request the *Brooks* instruction. "This raises an

44

issue that just began a moment ago. We've been watching standby counsel providing the defendant with unsolicited advice which is contrary to their role and the Court's rule." The judge determined there was no problem, but the prosecutor again complained after McCoy objected to the prosecutor's questioning of a witness: "Your Honor, once again, I think that we have a situation where there was an unsolicited advice by standby counsel . . . ." Once again, the judge found no issue. The next day, the prosecutor repeated his protests: "This is about the fourth time standby counsel has been whispering from the bench to the defendant what to say, what to do, without a specific request." The judge still did not see any indication of the standby counsel exceeding their role.

Even when standby counsel was clearly implicated in the issue before the court, the prosecutor opposed their participation. A concern arose about discovery materials that had been in the standby counsel's possession, which they attempted to address. The prosecutor immediately objected: "The State objects to standby counsel saying anything to the Court. His sole role is to give advice, not to be Mr. McCoy's mouthpiece." The prosecutor also objected to the judge asking standby counsel for a legal memo on the same discovery issue. In response to the standby counsel's protest that McCoy could not do any legal research on his own, the prosecutor retorted: "That's not a creation by the State. That's his own creation." Later in the trial, when McCoy's standby counsel attempted to assist with

managing scheduling for McCoy's witnesses, given his inability to coordinate from prison, the prosecutor objected: "First of all, I think standby counsel is exceeding its authority by just raising the subject."

Similarly inconsistent with the prosecutor's "special responsibility" to ensure justice is done, the prosecutor refused any effort to extend courtesies to McCoy, even when it would not have been an imposition or improper. During the defense's case, McCoy's standby counsel requested that the State pause its cross-examination of McCoy because a "critical" witness would not be available after the day scheduled for his testimony. The prosecutor objected: "That's not the State's problem, Your Honor. If he's under subpoena, he's required to be in court like any other witness regardless of what else he has scheduled."

The prosecution also made a number of disparaging remarks about McCoy throughout the trial, albeit not in front of the jury, which may have impeded his ability to adequately represent himself so as to prejudice his ability to conduct his defense. For example, during a discussion of McCoy's attire at a pre-trial office conference, the prosecutor stated "I don't care. You can dress him up. He's still a murderer." At one point, the prosecutor reproached McCoy directly: "Start acting like a man."

The prosecution's demeaning commentary focused particularly on McCoy's choice to represent himself: "the defendant may not know, because of his

46

inexperience with the law;" "as the Court knows and defendant may not know;" "clearly the defendant doesn't comprehend the concept of accomplice liability;" "quite frankly, the defendant might not be aware because he lacks legal training;" "[o]bviously, the defendant doesn't know what the word coercion means;" "[b]ecause of the rule of completeness, which obviously the defendant doesn't know about;" "[t]he defendant may not know because he is a novice in the legal field, notwithstanding his criminal record;" "[h]e obviously doesn't know what a legal question is;" "as the Court knows – the defendant obviously doesn't;" "I have been to law school, Your Honor. I understand the rules;" "I wish Mr. McCoy would have read the definition of hearsay in the rules of evidence;" "Your Honor, I'm sure the defendant does not know the case law;" "[t]he defendant should have been paying more attention;" "[t]he defendant obviously doesn't know what his Fifth Amendment rights are;" "the trouble with dealing with somebody with a limited education and no legal education is he doesn't clearly understand what he's reading;" "Mr. McCoy is attempting to read my mind and he's doing a very poor job of it because . . . I know what hearsay is;" "again, Mr. McCoy doesn't seem to get the thrust of the instruction;" [w]hat Mr. McCoy is arguing, correctly, surprisingly;" "[a]s the defendant obviously doesn't know;" "Mr. McCoy might not be familiar with the laws of the State;" and "[o]bviously the defendant, because of his lack of legal background and knowledge, doesn't understand the concept of

peers;" "*[t]he defendant has not prepared his case adequately.* He has relied on hearsay testimony of friends and relatives who are willing to get on the stand to say whatever he wants them to say, and now he's angry because he can't get it in. *That's what happens when you rely on made-up evidence.*"

The prosecutor's unprofessional conduct did not go unnoticed by the judge. Outside of the jury's presence, the judge made multiple efforts to rein in the prosecutor's behavior. First, after opening statements, the judge scolded the prosecutor, "Mr. [prosecutor], a couple of times I could have interrupted you. I didn't do that . . . . You went slightly overboard on your opening with a little bit of argument, okay?" Later, after McCoy protested the prosecutor's alleged improper vouching, the judge stated: "Well, I didn't hear it . . . . But if that [comment] was made, it is inappropriate, and [the prosecutor] should not make that statement if he said that." Although the record does not reflect what the prosecutor said, the judge also chided him following a discussion about cross-examination of a witness: "[Mr. prosecutor], watch your language." After the prosecutor complained that McCoy was being disrespectful to the judge, and McCoy apologized, the judge commented to McCoy that the prosecutor "also should extend to you the courtesy of the fact that you're acting as your own counsel . . . . No one should be cynical or smart-mouthed, to put it bluntly, about how you approach your case. So that applies to everybody in this case."

The judge also cautioned the prosecutor when McCoy requested copies of photographs of McCoy's tattoos that the prosecutor sought to enter into evidence. The prosecutor remarked, "[l]ook at your arm," prompting the judge to warn, "All right. Comments should be directed to the Court, not to the parties . . . . No displays of emotion should be shown by counsel and, Mr. [prosecutor], you have done this before. I'm going to caution you this time. Please."

The judge's most extensive—and final—reprimand to the prosecutor was delivered during the penalty phase of the trial:

> Listen, I'm reaching a level which I am very upset [about] [t]he way the prosecution is handling this case. I don't appreciate smart-ass remarks, pardon my French but that's what it is, [prosecutor]. You're being disrespectful to the Court as well as to Mr. McCoy and witnesses. Your antics in this trial have been totally disrespectful, in my view, of what properly should happen in a court procedure, particularly a serious matter like this. I don't appreciate off-the-cuff remarks. I don't appreciate your making frivolous statements in my view or matters which should be taken seriously. I don't like the cynicism that's being generated. I don't like the facial expressions that you make sometimes.

The Delaware Lawyers' Rules of Professional Conduct state that a lawyer shall not "engage in conduct intended to disrupt a tribunal or engage in undignified or discourteous conduct that is degrading to a tribunal."[87] "In keeping with the American Bar Association's standards governing prosecution and defense functions, we have held that it is improper for the prosecutor to disparage defense

---

[87] DEL. LAWYERS' RULES OF PROF'L. CONDUCT R. 3.5(d). *See Christopher v. State*, 824 A.2d 890, 893 (2003) (Del. 2003).

counsel or 'sarcastically to mock the defense case . . . .'"[88] While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one".[89]

The record reflects that the prosecutor mocked McCoy during cross-examination, attempted to prevent him from using his standby counsel for legal research and logistical assistance, and actively generated a level of "cynicism" that permeated the trial, to quote the trial judge. Even if some of their efforts at preventing McCoy's standby counsel from assisting him were unsuccessful and even if most of their sarcastic comments were made outside the jury's presence, the prosecutor's repetitive pattern of unprofessional conduct set a tone for trial that is inconsistent with the due process rights of a capital murder defendant.

A defendant has a right, under the Sixth Amendment to the United States Constitution, to proceed *pro se* in a criminal trial.[90] Article I, Section 7 of the Delaware Constitution, *explicitly* grants a defendant this right: "[i]n all criminal prosecutions, the accused hath a right to be heard by himself or herself and his or her counsel."[91] Prosecutorial misconduct that disparages a defendant for making the choice to proceed *pro se* interferes with his right to a fair trial and his right of

---

[88] *Drumgo v. State*, 976 A.2d 121, 124 (Del. 2009) (quoting *Bruce v. State*, 781 A.2d 544, 555 (Del. 2001)). *See also Swan v. State*, 820 A.2d 342, 354 (Del. 2003).
[89] *Hooks*, 416 A.2d at 205 (quoting *Berger v. United States*, 295 U.S. 78 (1935)).
[90] *Faretta v. California*, 422 U.S. 806 (1975).
[91] *See Hooks*, 416 A.2d at 189.

self-representation.  The record in this case reflects that the prosecutor's conduct was so demeaning and belligerent to McCoy, outside the presence of the jury, that it reasonably could have affected the effectiveness of McCoy's self-representation in front of the jury.

The record reflects a pattern of unprofessional conduct by the prosecutor that impugns the integrity of the judicial process.  Most of the sarcasm directed at McCoy related directly to his choice to exercise his right to defend himself under both the Sixth Amendment to the United States Constitution and Article 1, Section 7 of the Delaware Constitution.  Since McCoy will receive a new trial, we do not decide whether such conduct constitutes an independent basis for reversal.  The prosecutor's unprofessional conduct in McCoy's case is the antithesis of the high standards that are the hallmark of Delaware lawyers and must not be repeated.[92]

### Sufficiency of Evidence

McCoy's next argument is that the evidence presented by the State was based solely on the uncorroborated testimony of accomplices and that no physical evidence was presented.  McCoy contends that this evidence alone was not sufficient to convict him.  The State argues that it presented sufficient evidence for the jury, as the trier of fact, to convict McCoy of each crime for which he was charged.

---

[92] *Christopher*, 824 A.2d at 893.

A trial judge's denial of a defense motion for a judgment of acquittal is reviewed *de novo*. In doing so, "we must determine 'whether any rational trier of fact, after considering the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt.'"[93]

This Court has stated that "[t]he jury's function is to decide whether the evidence presented at trial proves, beyond a reasonable doubt, that the defendant committed the charged crimes."[94] "'[I]t is the sole province of the fact finder to determine witness credibility, resolve conflicts in testimony and draw any inferences from the proven facts.'"[95] We have also stated:

> The jury has "discretion to accept one portion of a witness' testimony and reject another part." But, in the rare case where there is an irreconcilable conflict in the State's evidence concerning the defendant's guilt, such as would preclude a conviction beyond a reasonable doubt, the trial court must remove the case from the jury's consideration and grant a motion for judgment of acquittal.[96]

In determining whether an irreconcilable conflict in the State's case exists, we apply the three-part test set forth in *Washington v. State*: first, the conflict must be in the State's evidence; second the only evidence on the defendant's guilt must be the uncorroborated testimony of one or more accomplices; and third, the

---

[93] *Bethard v. State*, 28 A.3d 395, 397-98 (Del. 2011) (quoting *Winer v. State*, 950 A.2d 642, 646 (Del. 2008)).
[94] *Washington v. State*, 4 A.3d 375, 378 (Del. 2010).
[95] *Id.* (quoting *Poon v. State*, 880 A.2d 236, 238 (Del. 2005)).
[96] *Id.* (quoting *Pryor v. State*, 453 A.2d 98, 100 (Del. 1982)).

inconsistencies must be material to a finding of guilt.[97] Applying this test in *Washington*, we reversed a jury conviction of robbery based on the irreconcilable accounts of the State's only witness and the victim of the crime.[98] In that case, the victim of the robbery expressly testified that the defendant was not present.[99] But the State's key witness, an accomplice to the robbery, testified that the defendant was present.[100] Based on these facts we found that irreconcilable conflict existed in the State's only evidence.[101]

Relying on our decision in *Washington*, McCoy contends that the State's case against him contained irreconcilable conflict. He argues that the inconsistencies between the testimony of White and Williams are enough to overturn the jury verdict. He also argues that the witnesses' testimony conflicts with the video surveillance offered by the State.

The State contends that it presented sufficient evidence for a rational trier of fact to determine that each of the statutory elements of the crimes charged was proved beyond a reasonable doubt. The State concedes that there was conflict among the testimony of White and Williams, but that the testimony of these two witnesses was not the only evidence offered by the State at trial. The bowling alley surveillance video shows two men approaching Munford's SUV and one man

---

[97] *Id.* at 379.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.* at 380.

walking to the driver's side door. The video also shows Munford falling out of the car, then getting up and attempting to flee. The man on the driver's side then enters the vehicle and drives away. The police recovered the vehicle not far from McCoy's house.

Although not conclusive evidence of the crime, the video supplements the testimony of the State's witnesses. As such, McCoy has failed to satisfy the second element of *Washington*. Further, although the testimony of the State's witnesses differed from one another's in some instances, the jury was capable of weighing the credibility of those witnesses and the veracity of their statements. Inconsistencies in testimony and credibility determinations have long been questions for jury resolution.[102] Although there was no physical evidence linking McCoy to the crime, the record does not support McCoy's argument that the evidence was insufficient to convict him.

### Accomplice Testimony Instruction

McCoy contends that the trial judge violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by failing to instruct the jury on accomplice testimony prior to Talan Bishop's testimony. The State submits that Bishop does not meet the definition of an "accomplice" under 11 *Del. C.* § 271(2)b. Since there

---

[102] *Tyre v. State*, 412 A.2d 326, 330 (Del. 1980) ("It has long been our law that the jury is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." (citing *State v. Matushefske*, 215 A.2d 443, 448-49 (Del. Super. Ct. 1965))).

was no objection at trial, the absence of an accomplice liability instruction related to Bishop's testimony will be reviewed for plain error.[103]

In *Brooks v. State*,[104] this Court held that a trial court must give a specific *Bland*[105] instruction to the jury any time an accomplice witness testifies.[106] "A witness qualifies as an accomplice if he or she fits the definition of one, whether charged as an accomplice or not."[107] An accomplice is a person that, "'intending to promote or facilitate the commission of [an] offense . . . aids or attempts to aid [another] person in committing it.'"[108] An accomplice need not have specifically intended the crime, so long as the result was a "foreseeable consequence" of the wrongful conduct.[109]

---

[103] *Brooks*, 40 A.3d at 350.

[104] *Id.* at 348.

[105] *Bland v. State*, 263 A.2d 286, 289-90 (Del. 1970).

[106] *Brooks*, 40 A.3d at 350. The specific instruction reads:

> A portion of the evidence presented by the State is the testimony of admitted participants in the crime with which these defendants are charged. For obvious reasons, the testimony of an alleged accomplice should be examined by you with more care and caution than the testimony of a witness who did not participate in the crime charged. This rule becomes particularly important when there is nothing in the evidence, direct or circumstantial, to corroborate the alleged accomplices' accusation that these defendants participated in the crime. Without such corroboration, you should not find the defendants guilty unless, after careful examination of the alleged accomplices' testimony, you are satisfied beyond a reasonable doubt that it is true and you may safely rely upon it. Of course, if you are so satisfied, you would be justified in relying upon it, despite the lack of corroboration, and in finding the defendants guilty.

*Id.* (citing *Bland*, 263 A.2d at 289-90).

[107] *Id.* (footnote omitted).

[108] *Erskine v. State*, 4 A.3d 391, 394 (Del. 2010) (quoting 11 *Del. C.* § 271(2)b.).

[109] *Claudio*, 585 A.2d at 1282 (citing *Hooks*, 416 A.2d at 197).

The record reflects that Bishop was not an accomplice to McCoy's crimes. Bishop did not aid or attempt to aid McCoy with the intention of promoting the commission of James Munford's murder, or any other crime. Although Bishop told conflicting stories about who he gave his mother's gun to after he stole it, Bishop never told police that he had any knowledge of McCoy's criminal plan or that he gave McCoy his mother's gun to help facilitate McCoy's criminal actions. Instead, Bishop testified that he merely gave the gun to McCoy to hold for him, and that he had thereafter attempted to retrieve the gun from McCoy. McCoy testified that Bishop never gave him the gun:

> Pertaining to the Talon Bishop, he did in fact call me trying to get the weapon back; but the way he said it was wrong. He brought the firearm out to Rodney Village to show it off and some people took it from him. Being that he knows I am from the area; I know the people, he came to me and asking me could I try to get it back. I attempted to get it back; and I wasn't able to.

The fact that Bishop stole the gun from his mother does not make him an accomplice to McCoy's subsequent criminal acts. Similarly, the fact that he gave McCoy the gun to hold, without any knowledge of McCoy's criminal intent, does not make him an accomplice because the consequences of his actions were unforeseeable. Thus, McCoy's argument that an accomplice testimony instruction should have been given, as to Bishop, is without merit.

We also note that the accomplice testimony instruction was read to the jury twice (when two other witnesses testified) before Bishop testified; McCoy repeated the language of the instruction in his closing arguments; and the judge recited the instruction once more before the jury deliberated. The jury was warned multiple times about the reliability of accomplice testimony. Thus, even if Bishop was an accomplice, it was not a "manifest injustice" that the jury did not hear the same instruction one additional time.

### Death Penalty Statute Upheld

McCoy contends that, in light of the United States Supreme Court's decision in *Alleyne v. United States*,[110] Delaware's death penalty statute, 11 *Del. C.* § 4209,[111] violates the Fourteenth and the Sixth Amendments to the United States Constitution by authorizing a judge to determine mitigating circumstances and whether the aggravating factors outweigh the mitigating factors. The State contends *Alleyne* is inapplicable to this case and has no effect on the constitutionality of § 4209. We review claims of a constitutional violation *de novo*.[112]

11 *Del. C.* § 4209 states: "Any person who is convicted of first-degree murder for an offense that was committed after the person had reached the person's

---

[110] 133 S. Ct. 2151 (2013).

[111] 11 *Del. C.* 4209(a).

[112] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010) (citing *Hall v. State*, 788 A.2d 118, 123 (Del. 2001)).

eighteenth birthday shall be punished by death or by imprisonment for the remainder of the person's natural life . . . ." In order to determine whether *Alleyne v. United States* renders § 4209 unconstitutional under the Fourteenth and Sixth Amendments to the Constitution we must briefly examine the Supreme Court's decision in *Ring v. Arizona.*[113] In *Ring,* the defendant was convicted of first-degree murder by a jury of his peers. Pursuant to the then-current Arizona death penalty statute, the trial judge alone determined the presence or absence of aggravating factors for the imposition of the defendant's death.[114] The trial judge found that the aggravating factors outweighed the mitigating factors and sentenced the defendant to death.[115] The Supreme Court reversed, holding that the Arizona statute violated the defendant's Sixth Amendment right to a jury trial in capital prosecutions.[116] In so holding, the Court instructed that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury finding of any fact on which the legislature conditions an increase in their maximum punishment."[117]

After the Supreme Court's decision in *Ring,* 11 *Del C.* § 4209 was amended. This Court upheld the amended statute as constitutional in *Brice v. State.*[118] In *Brice,* we found that *Ring* "does not . . . require that the jury find every fact relied

---

[113] *Ring v. State,* 536 U.S. 584 (2002).
[114] *Id.* at 588.
[115] *Id.* at 594.
[116] *Id.* at 609.
[117] *Id.* at 589.
[118] *Brice v. State,* 815 A.2d 314 (Del. 2003).

upon by the sentencing judge in the imposition of the sentence.[119]  We went on to state:

> Under the 2002 Statute, the sentencing judge retains exclusive responsibility for weighing the aggravating and mitigating factors, and for the ultimate sentencing decision.  Once the jury determines that a statutory aggravating factor exists, the defendant becomes death eligible.  Although a judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors, it is not that determination that increases the maximum punishment. Rather, the maximum punishment is increased by the finding of the statutory aggravator. At that point a judge can sentence a defendant to death, but only if the judge finds that the aggravating factors outweigh the mitigating factors. Therefore, the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment. Rather, it ensures that the punishment imposed is appropriate and proportional.[120]

In *Alleyne v. United States*, the issue revolved around a federal statute that defined the minimum mandatory sentence for using or carrying a firearm in relation to a crime of violence. [121]  Under the statute, the minimum sentence was five years, but the sentence increased to seven years if a weapon was brandished during the commission of the crime.[122]  The jury convicted the defendant of "using or carrying" a firearm while committing a robbery, but did not find that the defendant had brandished a weapon during the commission of the robbery.[123]

---

[119] *Id.* at 322.
[120] *Id.* (footnote omitted) (citation omitted).
[121] *Alleyne*, 133 S. Ct. at 2156.
[122] *Id.*
[123] *Id.*

Thus, when the trial judge determined, in his own discretion, that the defendant had brandished a weapon and recommended a seven-year sentence, the defendant objected. He argued that the verdict made clear that jury did not find brandishing beyond a reasonable doubt and that he was subject only to the 5-year minimum for "us[ing] or carr[ying] a firearm."[124] Despite his objection, the trial court sentenced the defendant to seven years and the decision was affirmed by the Court of Appeals.[125] The Supreme Court of the United States, however, reversed the judgment. The Court held that any fact that increases a mandatory minimum for a sentence is an "element" of the offense that has to be found by the jury.[126] Significantly, however, the Court was careful to note: "Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."[127]

McCoy contends the holding in *Alleyne* renders 11 *Del. C.* § 4209 unconstitutional. He argues that it is the jury that must make the decision as to whether aggravating factors exist to increase the punishment of a defendant. McCoy's argument is misplaced. The holding set forth by the Supreme Court in *Alleyne* does not affect the constitutionality of 11 *Del. C.* § 4209 for the reasons we

---

[124] *Id.*
[125] *Id.*
[126] *Id.* at 2161-63.
[127] *Id.* at 2163.

explained in *Brice*. Specifically, under § 4209, it is the jury that determines whether aggravating factors exist to increase the punishment of the defendant, not the trial judge. Thus, unlike the statute at issue in *Alleyne*, the trial judge does not have sole discretion to increase the defendant's sentence. Accordingly, McCoy's final argument is without merit.

### *Conclusion*

The Superior Court's judgment of convictions is reversed and McCoy's death sentences are vacated. This matter is remanded to the Superior Court for further proceedings in accordance with this opinion.