IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAM S. SELLS, III, | § | |
| | § | No. 429, 2013 |
| Defendant-Below, | § | |
| Appellant, | § | |
| | § | Court Below: |
| | § | |
| v. | § | Superior Court of the |
| | § | State of Delaware, in and for |
| STATE OF DELAWARE, | § | Kent County |
| | § | |
| Plaintiff-Below, | § | Cr. I.D. No. 1108023648 |
| Appellee. | § | |

Submitted: December 10, 2014
Decided: January 27, 2015

Before **STRINE**, Chief Justice, **HOLLAND**, **RIDGELY**, **VALIHURA** and **VAUGHN**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Andre Beauregard, Esquire (*argued*), Brown, Shiels & Beauregard, LLC, Dover, Delaware, and Adam D. Windett, Esquire, Hopkins & Windett, LLC, Dover, Delaware, for Appellant.

John Williams, Esquire (*argued*), Department of Justice, Dover, Delaware, for Appellee.

**VALIHURA**, Justice:

Defendant-Below, Appellant William S. Sells, III ("Sells") appeals from a Superior Court judgment where the jury found Sells guilty of Robbery in the First Degree, Possession of a Firearm During the Commission of a Felony, Possession of a Firearm by a Person Prohibited, Wearing a Disguise During the Commission of a Felony, six counts of Aggravated Menacing, and five counts of Reckless Endangering in the Second Degree. Sells was sentenced as follows: as to Robbery First Degree, twenty-five years at Level V incarceration pursuant to 11 *Del. C.* § 4214; as to Possession of a Firearm During the Commission of a Felony, twenty-five years at Level V incarceration pursuant to 11 *Del. C.* § 4214; as to Possession of a Firearm by a Person Prohibited, eight years at Level V incarceration pursuant to 11 *Del. C.* § 4214; as to Wearing a Disguise During the Commission of a Felony, five years at Level V incarceration pursuant to 11 *Del. C.* § 4214; as to six counts of Aggravated Menacing, five years at Level V incarceration pursuant to 11 *Del. C.* § 4214 on each count; and as to five counts of Reckless Endangering Second Degree, one year at Level V incarceration pursuant to 11 *Del. C.* § 4214 on each count. Thus, Sells was sentenced as a habitual offender to an aggregate Level V sentence of ninety-eight years. A timely notice of appeal was filed on August 16, 2013.

Sells raises two arguments on appeal. First, Sells argues that the Superior Court erred when it denied his motion to sever his trial from his co-defendant's,

Russell Grimes ("Grimes"). Sells contends that Grimes would have provided exculpatory evidence if the trials had been severed. Second, Sells argues that the Superior Court erred in finding one of his peremptory challenges of a white juror violated the United States Constitution, and that it erred in upholding the State's *Batson*[1] challenge. We agree with Sells' as to his second claim and, therefore, need not reach the first claim. Accordingly, the judgment below is reversed as to Sells' conviction.[2]

## I.  FACTUAL AND PROCEDURAL HISTORY[3]

On August 26, 2011, a masked man entered the First National Bank of Wyoming in Felton, Delaware (the "Bank"), displayed what appeared to be a firearm, ordered the Bank manager to exit her office, and told the tellers to empty the cash drawers. During the robbery, the man jumped over a counter in the Bank and blood was later discovered on the ceiling above that counter.[4] The man placed the money from the cash drawers into a satchel and exited the Bank. These events were recorded on the Bank's security cameras. The money taken from the Bank contained dye packs, a security device designed to stain money taken from the

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[2] Grimes is pursuing a separate appeal to this Court; his claims will be addressed separately in his appeal.

[3] The facts are drawn from the record presented to the trial court below and the briefing on appeal.

[4] The testimony of a Senior Forensic DNA Analyst revealed that the samples taken from inside the Bank were not consistent with either Grimes or Sells.

2

Bank, and "bait bills," bills for which the bank had recorded and maintained serial numbers in case of theft. Over $53,000 was taken from the Bank.

When the suspect exited the Bank, he entered a black SUV. An employee of the Bank who ran outside during the robbery testified that she saw the SUV driving away from the Bank and that the SUV was emitting "pink, red smoke" which indicated to her that the dye pack had gone off. Officer Keith Shyers of the Harrington Police Department ("Officer Shyers") also observed the SUV, and testified that he saw a black male "hanging out [of] the window" of the SUV and a "red poof" that "looked like some kind of paint."

Because the vehicle was traveling at a high rate of speed and he thought something was suspicious, Officer Shyers turned around and began following the SUV. Officer Shyers then heard a call that went out over the radio dispatch for a robbery that had just occurred at the Bank. Officer Shyers was the first officer to begin pursuing the car and was the lead vehicle for much of the pursuit. A few minutes into the pursuit, the SUV stopped at an intersection and the passenger got out of the vehicle and began firing shots at the pursuing officers. Officer Shyers testified that he was approximately 20 to 30 feet from the passenger and that the passenger was a black male wearing a grey hooded sweatshirt.

The passenger then got back in the SUV and a high-speed pursuit ensued involving officers from the Delaware State Police, Harrington Police Department,

3

and Felton Police Department.  At various points during the pursuit, the passenger popped up through the sunroof and fired shots at the officers.  The left rear tire on Officer Shyer's vehicle was shot and he abandoned his vehicle and jumped in another officer's car to continue the pursuit.

Corporal Scott Torgerson, an assistant shift supervisor for the Delaware State Police ("Corporal Torgerson"), who was driving a fully-marked Crown Victoria, took over as the lead vehicle in the pursuit.  The passenger continued to fire shots at the officers from the sunroof.  The SUV drove around spike strips that had been set in its path and Corporal Torgerson continued to pursue it.  Shortly thereafter, the driver lost control of the SUV and it came to rest in a ditch with its back tires stuck.  The driver and the passenger both exited the SUV and began fleeing and Corporal Torgerson fired shots at them.  The driver of the SUV was shot in the leg by Corporal Torgerson and was later identified as Grimes.  The passenger of the vehicle escaped on foot.

The SUV was registered to Sophia Jones ("Jones").  Jones was Sells' girlfriend.  Jones and Sells shared an apartment and had a child together.  Jones testified that she did not know who was driving the SUV at the time of the bank robbery because she had not seen the SUV in over a week, but that the last time she had seen the SUV, Sells had been driving it.  She testified that Sells had the SUV because he was trying to sell it.

After the robbery, police officers searched the apartment that Jones and Sells shared and asked her questions. Jones gave the officers Sells' cell phone number and told them that Sells' best friend was named "Russell." On August 28, 2011, Jones contacted the police and inquired about getting her SUV back. The officers asked Jones if Sells had contacted her, and she replied that he had called her, inquired after his son, and asked whether the police had been to the apartment because he had heard about the SUV being in an incident with Grimes.

On September 6, 2011, Sells was found barricaded in a room at the Shamrock Motel. The SWAT team deployed tear gas grenades, smoke grenades, stringball grenades,[5] and stun grenades into the room through a small bathroom window that opened to the outside in order to get Sells to exit the room, but those efforts were unsuccessful. The officers used so many of the various types of grenades that Sergeant Ennis testified that he had "no idea how [Sells] stayed" in the room.[6]

When the standoff ended and Sells was taken into custody, United States currency was collected from three separate locations of the motel room: in the living room, in the bathroom, and outside the hotel underneath the bathroom window. Many of the bills that were collected as evidence at the hotel were torn

---

[5] Stringball grenades are were described by Sergeant Ennis as "a rubber softball [that] has small little tiny rubber balls that are inside of it; when it explodes, the rubber balls fly around."

[6] The officers completely exhausted their supply of grenades and a helicopter had to deliver additional grenades.

and burned. Some of the money that was collected in the living room area of the motel room also appeared to be stained with a red dye. Sells' defense counsel elicited testimony on cross examination that the red stains on the currency could have been caused by some of the explosives, which discharge red dye. A large red stain also appeared on one of the walls of the motel room. Around 50 bills were collected from the motel room ranging in denominations from $1 to $50. The total value of the money collected was at most $769.[7]

Witnesses testified that Sells had used $475 of money with a red dye stain to purchase cigarettes, and that 34 of those bills matched bait bills that were taken from the Bank. One of Sells' female companions also testified that Sells used $3,500 in cash to purchase a car and that some of that money had red on it. That money was never recovered.

On November 7, 2011, Sells was indicted on one count of Robbery First Degree, one count of Conspiracy Second Degree, one count of Conspiracy First Degree, two counts of Possession of a Firearm During the Commission of a Felony, two counts of Possession of a Firearm by a Person Prohibited, one count of Wearing a Disguise During the Commission of a Felony, six counts of Aggravated Menacing, one count of Felony Theft, and five counts of Attempted Murder First

---

[7] Detective Daddio testified that $31 was found outside the hotel room, the living area had $44 and one-half of a $50 bill. In the bathroom there was $418 recovered and an additional $226 in partial bills.

Degree. On November 29, 2011, Sells entered a plea of not guilty and requested a trial by jury. On April 10, 2013, Sells filed a motion to sever (the "First Motion to Sever") his trial from that of his co-defendant, Grimes. That motion, while not included in the record before us, appears to have been based on a claim that Sells and Grimes planned to present defenses that were antagonistic to one another. A hearing was held on the motion on April 18, 2013, and Sells was given an opportunity to file a supplemental memorandum of law on April 23, 2013. The Court denied the First Motion to Sever on April 30, 2013, and scheduled trial to begin on May 7, 2013. On May 1, 2013, Sells filed a new motion to sever (the "Second Motion to Sever").[8]

The Second Motion to Sever stated that Sells' defense counsel met with Grimes on April 30, 2013, and that Grimes made statements that could have potentially exonerated Sells of any wrongdoing. Sells argued that he would be extremely prejudiced by the absence of the exculpatory testimony that Grimes would provide, and that Grimes would not testify at a joint trial due to the likelihood that his criminal record would be introduced by the State, but that if the trials were severed, Grimes would testify on Sells' behalf. The Second Motion to

---

[8] The Superior Court was displeased that the new motion to sever had been filed so close in proximity to the start of the trial and at a time when the parties knew that the Superior Court judges were at a judicial retreat.

Sever included an Exhibit -- a statement signed by Sells' defense counsel that

stated:

> 1.     On Tuesday April 30, 2013, undersigned counsel met with Russell Grimes . . . and obtained a detailed statement from Grimes. Grimes advised that he was familiar with Defendant Sells and has known Sells for several years.

> 2.     Grimes stated that he was living in Winston-Salem, North Carolina for seven months in 2011, contacted Sells in the summer of 2011, and arranged to purchase a black Ford Explorer from Sells. He did not purchase the vehicle with the intent to use it in the robbery. Nor did he discuss any criminal activity with Sells.

> 3.     . . . Upon [Grimes'] arrival in Delaware, he contacted Sells and arranged to meet to purchase the Ford Explorer. Grimes paid $1,500.00 cash for the vehicle. . . .

> 4.     Grimes stated that he believed the vehicle to be insured by Sophia Jones, Sells' girlfriend and an insurance card was in the car indicating the same. He further stated that the transfer of the vehicle was not completed properly and that he could not do so because of warrants for his arrest in Delaware.

> 5.     *Grimes stated that he was driving the vehicle at the time of the alleged robbery, that Sells was not with him, and that Sells was not involved in the robbery of the First National Bank of Wyoming. Grimes was unequivocal in his assertion that Sells could not have been involved in the robbery.* He described the suspect that committed the robbery as a male of Spanish descent, six feet tall, thin build, with a tear drop tattoo under his eye.

> 6.     *Grimes stated that he does not intend to testify at the scheduled joint trial. However, should the trials be severed, Grimes advised that he would be willing to testify on Sells' behalf and he would testify that Sells was not present for, did not plan, nor participate in the robbery at the First National Bank of Wyoming.* Grimes would testify that he was in sole possession and control of the Ford Explorer he bought from Sells and rebut evidence introduced by the State for the purpose of implicating Sells.[9]

---

[9] App. to Opening Br. at A13-14 (emphasis added).

The Superior Court was displeased with the tardiness of the motion to sever and with the fact that the motion to sever did not include a sworn affidavit from Grimes. Instead, it included only a signed statement from defense counsel describing the conversation that they had with Grimes. In considering the Second Motion to Sever at the pre-trial hearing, the Superior Court stated:

> I'm looking at *Butler*,[10] . . . [T]he unsigned by Mr. Grimes exhibit, would certainly substantiate a bona fide need on the part of Mr. Sells for the testimony. The substance of the testimony is decidedly relevant. It is completely exculpatory in nature and effect. The fourth requirement, of course, is that the codefendant will, in fact, testify if the cases are severed. So that's one issue. Then, if there is a showing on the first four, then the Court's to examine the significance of the testimony, and I would say it's clearly significant; assess the extent of the prejudice caused by its absence, and although it's not [one] hundred percent, I would certainly say it's substantial; pay close attention to judicial administration, which would have to be ignored completely; and give weight to the timeliness, which is, as has been mentioned previously, atrocious.

The Superior Court then questioned Grimes, who was proceeding *pro se*, to determine whether he would, in fact, testify on Sells' behalf if the trials were severed. Grimes initially appeared to be confused about what the Superior Court was asking him. After the Superior Court explained the factors that it was required to consider to determine whether to grant a motion to sever, the following colloquy occurred between the Court and Grimes:

---

[10] *U.S. v. Butler*, 611 F. 2d 1066 (5th Cir. 1980).

9

| | |
|---|---|
| Court: | So let's get to the issue about whether the codefendant will, in fact, testify consistent with the information that he's given. Does Mr. Grimes or his standby counsel want to take any position on that? |
| Grimes: | Yes. Good morning, your Honor. |
| Court: | Good morning, Mr. Grimes. |
| Grimes: | I didn't tell anybody that I was testifying. |
| Court: | What's that? |
| Grimes: | I didn't say I was testifying to this, what's on this paper. I don't even know what they talking about, somebody sold me guns. They sold me -- |
| Court: | Don't get into any facts. The question is whether you will testify as you have described -- as has been described in this exhibit. And if somebody wants to hand him a copy of the exhibit, that's fine. |
| Grimes: | Where's the exhibit, sir? |
| Court: | I just finished saying if somebody wants to hand you a copy of it. |
| Grimes: | No, no, no. Nobody sold any guns. I didn't have any guns. |
| Court: | I don't know that it's -- |
| Grimes: | I didn't say nothing like that. |

Defense counsel had not brought a copy of the Second Motion to Sever or the attached exhibit to the courtroom, and no one had a copy that Grimes was able to review. The record suggests that Grimes was provided with a copy of the First Motion to Sever, and not the affidavit signed by defense counsel indicating Grimes' proffered testimony in a severed trial. Grimes further stated:

the only thing I would be willing to testify, the truck situation, me buying the truck and me coming from North Carolina to get the truck, that's the only thing I'm testifying to, if I would testify. Anything

10

other than that, I have nothing to do with it. I don't know what they are talking about.

After the Court dealt with some other preliminary matters, Sells' defense counsel asked to be excused. When he returned, counsel explained that Grimes did not have the correct affidavit in front of him, but now Grimes had signed an exhibit to Sells' Second Motion to Sever describing the exculpatory testimony that Grimes would be willing to provide if the trials were severed.[11] At this point, Grimes indicated that he would be offering at trial the affirmative defense of duress. The State indicated that Grimes would need to take the stand and testify during the trial if he wished to argue that he was under duress. After speaking with his standby counsel, Grimes then stated, "I understand now that I would have to testify, so if that's what it is, then that's what it will be." Sells' Second Motion to Sever was then denied because Grimes indicated that he would be testifying at trial.

The Superior Court proceeded to select a jury on May 6, 2013. A joint jury trial commenced on May 6, 2013, and concluded on May 28, 2013. There were

---

[11] The version of Exhibit A signed by Grimes is not included in the record provided to this Court. Counsel for Sells explained that this document was provided to the trial court and no copies were made because there was no paper in the copy machine. Later, counsel was unable to find this signed document in the court file. On December 10, 2014, at oral argument, this Court asked counsel to attempt to locate Grimes' affidavit. Not receiving a response, this Court sent counsel a letter on January 15, 2015, requesting an update on what efforts were made and what counsel determined regarding the missing affidavit. On January 16, 2015, the State advised the Court that the State never received a copy of the Second Motion to Sever or the Grimes affidavit. On January 20, 2015, Sells' counsel filed a response stating that during the course of this appeal, they had made additional efforts to locate the missing signed affidavit but were unable to locate it.

11

approximately sixty witnesses.  On the eighth day of trial, after the State presented its case-in-chief, Grimes advised the Superior Court that he did not intend to testify.  Neither Sells nor Grimes testified at their joint trial.[12]

Sells then renewed his motion to sever on May 20, 2013, (the "Third Motion to Sever") and the Superior Court denied the motion in a bench ruling that day.[13] Sells never mentioned the Third Motion to Sever in his opening brief and did not include the pages from the transcript where the Third Motion to Sever was made and denied in the appendix to his opening brief.[14]

Sells raises two claims on appeal.  First, he argues that that the trial court abused its discretion in denying his request for severance of the trials.  Second, he argues that the trial court erred when it ruled that Sells' peremptory challenge to Juror #8 was a reverse-*Batson*[15] violation.  Because we find merit in the second claim and, accordingly, reverse, we need not reach Sells' first claim.[16]

---

[12] Thus, Grimes did not appear as a trial witness to present an affirmative defense of duress.

[13] App. to State's Answering Br. at B59 ("[Sells' Defense Counsel]:  I would renew defendant Sells' motion to sever in light of Mr. Grimes' decision not to testify.  There was a pretrial issue.  He signed -- there was an exhibit that he signed that he would be testifying on Mr. Sells' behalf, and now he's elected not to testify.  The Court:  I don't know that there is -- at any rate, fine. Your motion is noted, and overruled.").

[14] *See Tricoche v. State*, 525 A.2d 151, 154 (Del. 1987) ("[T]he appellant [has] the burden of producing 'such portions of the trial transcript as are necessary to give this Court a fair and accurate account of the context in which the claim of error occurred' and the record 'must include a transcript of all evidence relevant to the challenged finding or conclusion.'" (citing DEL. SUPR. CT. R. 9(e)(ii), 14(e))).

[15] *Batson v. Kentucky*, 476 U.S. 79 (1986).  Traditionally, a *Batson* challenge has been used by defendants objecting to the prosecutor's use of peremptory strikes to remove from the venire members of the defendant's racial group.  When this objection is used by the State in response to

12

## II. DISCUSSION

### A. *The Trial Court Erred in Seating Juror #8*

#### 1. *Standard of Review*

Sells' second claim on appeal is that the trial court erred in ruling that his peremptory challenge of a juror violated *Batson v. Kentucky*,[17] and erred in ordering the juror to be seated. Sells claims that the State failed to make a *prima facia* case that his peremptory challenge constituted racial discrimination. We agree.

In objecting to a peremptory challenge, the moving party bears the burden of establishing a *prima facie* case that the use of the peremptory strike constitutes

---

the defendant's use of peremptory strikes in violation of the Equal Protection Clause, it is known as a "reverse *Batson* challenge."

[16] While we do not reach the issue of whether the trial court abused its discretion in denying Sells' motions to sever, we note that the trial court properly weighed the various factors to be considered and initially appeared inclined to grant the severance motion until the State inquired about whether Grimes would be raising an affirmative defense. In first applying the *Butler* factors, the Court found that Grimes' proffer had the potential to completely exonerate Sells. Thus, the fourth factor -- whether Grimes would in fact testify if the cases were severed -- was the lynchpin for determining whether the trial court should grant the Second Motion to Sever. If the trial court believed that severance should have been granted based upon Grimes' signed affidavit, it should have granted the motion at the outset. Instead, the State entered the colloquy and persuaded the Court that since Grimes was intending to offer an affirmative defense, he would therefore need to take the stand in the joint trial. It was only after this development that the trial court concluded that a severance was unnecessary. When, on the eighth day of trial, Grimes decided that he was not going to testify, Sells promptly renewed his motion to sever. At that point, given the trial court's prior conclusion that Grimes' proffered testimony could potentially exonerate Sells, and that Grimes had stated in an affidavit that he was prepared to so testify in a severed trial, the trial court should have set forth its reasons rather than summarily deny the renewed motion.

[17] 476 U.S. 79 (1986).

racial discrimination.[18] The burden then shifts to the proponent of the strike to present a race-neutral explanation.[19] If a race-neutral explanation is tendered, the trial court must decide whether the opponent of the peremptory strike has proved purposeful discrimination by the proponent of the strike.[20] As to the first step of the *Batson* analysis, we review the trial court's factual findings for an abuse of discretion, but we review legal conclusions *de novo*.[21]

## 2. Analysis

The Sixth Amendment to the United States Constitution and Article I, Section 7 of the Delaware Constitution recognize a defendant's "fundamental right to trial by an impartial jury."[22] A peremptory strike safeguards that fundamental right.[23] Juror impartiality must be maintained not only in the interest of fairness to those accused, but also to assure the integrity of the judicial process.[24] However, a peremptory strike may not be used by the State or the defendant in violation of the

---

[18] *Barrow v. State*, 749 A.2d 1230, 1238 (Del. 2000).

[19] *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995)).

[20] *Barrow*, 749 A.2d at 1238 (citing *Purkett*, 514 U.S. at 767).

[21] *See Johnson v. California*, 545 U.S. 162, 170 (2005) ("[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."); *Jones v. State*, 938 A.2d 626, 632 (Del. 2007) (considering whether the evidence supported the conclusion that the State established a *prima facie* case of a *Batson* violation); *Outten v. State*, 650 A.2d 1291, 1299 (Del. 1994) (deferring to the trial court's findings that the defendants did not establish a *prima facie* case).

[22] *Knox v. State*, 29 A3d 217, 223-24 (Del. 2011).

[23] *Schwan v. State*, 65 A.3d 582, 588 (Del. 2013).

[24] *Id.*

14

Equal Protection Clause of the United States Constitution.[25]  In *Batson v.*

*Kentucky*, the United States Supreme Court established a three-step process to

analyze claims that a party utilized peremptory strikes in violation of the Equal

Protection Clause.[26]  First, the opponent of the strike must make a *prima facie* case

of discrimination "by showing that the totality of the relevant facts gives rise to an

inference of discriminatory purpose."[27]  Second, once the opponent makes a *prima*

*facie* case, then the burden shifts to the proponent of the strike to present a neutral,

non-discriminatory explanation "related to the particular case to be tried."[28]  Third,

if a neutral, non-discriminatory explanation is tendered, the trial court must

determine if the opponent of the strike has established purposeful discrimination by

the proponent.[29]

In this case, the State made a *Batson* challenge during jury selection because

it claimed that the defendant had stricken three white jurors.  As a preliminary

matter, the factual premise of the State's challenge was not correct.  Sells exercised

one of his peremptory challenges to strike a black juror and two peremptory

---

[25] *See Burton v. State*, 925 A.2d 503 (Del. 2007) (applying the *Batson* three-step process to an objection made by the State to the defendant's use of a peremptory challenge).

[26] *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986).

[27] *Id.* at 93-94 (citation omitted).

[28] *Id.* at 98.

[29] *Id.*

challenges to strike two white jurors.[30]  Moreover, Sells argues that his strikes of

two white jurors and one black juror were consistent with the racial demographics

of Kent County.[31]  Accordingly, he argues that there was an insufficient factual

basis for the State's challenge.  Sells' counsel objected on the record during the

trial that the State had failed to establish a pattern of racial discrimination.

As this Court recently explained in *McCoy v. State*, "[a] State's *Batson*

objection to the defendant's exercise of a peremptory challenge is known as a

reverse *Batson* claim."[32]  In *McCoy*, we set forth the following test to be applied in

analyzing a reverse *Batson* claim:

> When the State makes a reverse *Batson* challenge to a peremptory
> strike a three-step inquiry is required.  First, the trial judge must
> determine whether the State has made a *prima facie* showing that the
> defendant exercised a peremptory challenge on the basis of race.
> Second, if the showing is made, the burden shifts to the defendant to
> present a race-neutral explanation for striking the juror in question.
> Although the defendant must present a comprehensible reason, "[t]he
> second step of this process does not demand an explanation that is
> persuasive, or even plausible"; so long as the reason is not inherently
> discriminatory, it suffices.  Third, the trial judge must then determine
> whether the State has carried its burden of proving purposeful
> discrimination.  This final step involves evaluating "the

---

[30] Sells' fourth peremptory challenge was exercised to remove a white female juror.  This strike occurred after the State raised its *Batson* challenge.  Sells offered two reasons for exercising this peremptory challenge:  that the prospective juror was a cashier and was employed by law enforcement.  The trial court held that the latter ground was a valid race-neutral reason for the strike.

[31] He notes that according to the most recent census data, Kent County is 68.8% white and 24.97% African American.  *See* U.S. Bureau of the Census, Population Estimates Program, available at http://www.census.gov/poptest/index.html.

[32] *McCoy v. State*, 2015 WL 292575, at *14 (Del. Jan 20, 2015).

persuasiveness of the justification" proffered by the [defendant], but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike," which is usually the State in a reverse *Batson* challenge.[33]

Thus, a reverse *Batson* claim arises upon the prosecution arguing that a minority defendant is engaging in racial discrimination because he is striking white jurors.

In responding to the State's reverse *Batson* challenge, the Superior Court stated:

> As counsel for Mr. Sells know [*sic*] and as Mr. Grimes may well not, while these strikes are peremptory and can be made for any reason or no reason, basically, they cannot be exercised on the basis of race. I think I will not change anyone seated to this point, but I would simply say to counsel for Defendant Sells and to Mr. Grimes that from this point forward, *because of the pattern that has emerged*, that any excusal of a Caucasian juror will have to be for an express reason other than race.[34]

The Superior Court stated that it was not requiring the defendants to provide reasons for jurors that had already been excused, but that going forward, a stated reason would be necessary.

Grimes then attempted to use a peremptory strike on Juror #8, a white male. The following exchange occurred:

Court:      Mr. Grimes, this is your strike. What is your nonracially-based reason?

---

[33] *Id.* at *17-18 (internal citations omitted).

[34] App. to Opening Br. at A21-22 (emphasis added).

| | |
|---|---|
| Grimes: | The nonracially-based reason is because he's employed by Kent County Levy Court. I guess he's employed by law enforcement through them. |
| Court: | Levy Court is not law enforcement. |
| Grimes: | Well, I don't know. |
| Court: | Well, I do, and it's not. |
| Grimes: | I don't know if that's the reason he's saying he's employed by law enforcement or not. I'm saying he's employed by the court, and it says he's employed by law enforcement. |
| Court: | He's not employed by this court. |
| Grimes: | Okay. I understand what you're saying, your Honor. I'm going by what it says on the jury profile, and on the jury profile, it says specifically that he's employed by law enforcement. So when I see "law enforcement," and this is a case involving law enforcement, the neutral racial bias -- I mean the base reason -- |
| Court: | I understand. |
| Grimes: | -- is that he's employed by law enforcement, whether it's the court or not. I just see that he's employed by law enforcement, and this is a case involving law enforcement. |
| State: | But so is Juror 11 . . . who happens to be a black male, yet this defendant has only struck whites. Your Honor, and just for the record, While [Juror #8] does indicate he's employed in Kent County Levy Court, his occupation is a mechanic. |

The Court allowed Juror #8 to remain seated. Sells then exercised a peremptory challenge with respect to the same juror for the same reasons.[35] The following exchange occurred between the Court and Sells' counsel:

---

[35] App. to Opening Br. at A30 ("Your Honor, the reason for the strike is according to the information we have from the court, he was employed or he is employed by law enforcement.").

18

| | |
|---|---|
| Court: | Okay. You heard everything that was said two minutes ago, and you heard my ruling on that. You have nothing to add to that; is that correct? |
| Counsel: | Except, your Honor, that now it's our motion to strike. |
| Court: | No, no. It's no different, yours or Mr. Grimes. |
| Counsel: | Well, there is a difference. |
| Court: | Mr. Grimes made the same motion and it was denied. He's seated. Now unless you have something new to add, then I'm going to be really concerned about why we're going through this exercise at all. |
| Counsel: | I'm establishing a record, in that, we believe he's employed by law enforcement. |
| Court: | Okay. Fine. He's going to be seated. |

Sells now argues on appeal that the trial court erred in finding a pattern of racial discrimination in the exercise of his three peremptory strikes, and that Juror #8's response to the jury questionnaire indicating that he was a member of law enforcement was a valid race-neutral basis to permit his removal by the defense.

In this case, the State had the burden of establishing a *prima facie* case that the non-moving party (Sells) intentionally used his peremptory challenges to discriminate against a cognizable group. The trial court found a pattern of racial discrimination after Sells struck two Caucasian jurors and one African American juror. As we stated in *McCoy*, "[a]lthough there are no fixed rules, we acknowledge that 'a pattern of strikes against jurors of a particular race **could** be

19

*prima facie* evidence of racial discrimination.'"[36] But here, the State engaged in no analysis to support its claim that a pattern of racial discrimination existed -- other than aggregating Grimes' and Sells' peremptory challenges and stating that a pattern existed because the defendants, collectively, used five of six strikes on white jurors.[37] "It is the opponent of the strike's burden to set forth 'facts and other relevant circumstances' to support an inference of discrimination."[38] We do not believe that the State established a *prima facie* case of discrimination based upon Sells' attempt to strike two white jurors.

As the United States Supreme Court explained in *Batson,* "[w]e have confidence that trial judges, experienced in supervising *voir dire,* will be able to

---

[36] *McCoy*, 2015 WL 292575, at *19-20 (quoting *State v. Mootz*, 808 N.W.2d 207, 217 (Iowa 2012)).

[37] *See* App. to Opening Br. at A21-23:

| State: | Your Honor, the State is making a *Batson* change [*sic*]. Both defendants have -- three jurors that they have each stricken have all been white. |
|---|---|
| Court: | As counsel for Mr. Sells know [*sic*] and as Mr. Grimes may well not, while these strikes are peremptory and can be made for any reason or no reason, basically, they cannot be exercised on the basis of race. |

I think I will not change anyone seated to this point, but I would simply say to counsel for Defendant Sells and to Mr. Grimes that from this point forward, because of the pattern that has emerged, that any excusal of a Caucasian juror will have to be for an express reason other than race.

. . .

We're talking five for six at this juncture. All that's necessary is a stated reason.

[38] *McCoy*, 2015 WL 292575, at *20 (citing *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986)).

20

decide if the circumstances concerning the . . . use of peremptory challenges creates a prima facie case of discrimination against . . . jurors."[39] A trial court is within its discretion to determine that there is a *prima facie* case of discrimination so long as there is sufficient evidence to permit the trial judge to draw an inference that discrimination has occurred.[40] While the first step of the *Batson* analysis was not intended to be an onerous one,[41] we are confident that there is insufficient evidence here to permit the trial court to draw an inference that discrimination has occurred. The State presented no evidence as to what the overall racial composition of the venire was, for example. The fact that Sells struck only two white jurors is an insufficient evidentiary basis for the trial court to draw an inference that a "pattern" of racial discrimination has occurred.

---

[39] *Batson*, 476 U.S. at 97.

[40] *Johnson v. California*, 545 U.S. 162, 169 (2005). In *Johnson v. California*, a number of prospective jurors were removed for cause until forty-three eligible jurors remained, three of whom were black. The petitioner was a black male convicted of second degree murder and assault on a nineteen-month old Caucasian child. The prosecutor used three of his twelve peremptory challenges to remove the three prospective black jurors. The resulting jury, including alternates, were all white. Upon the petitioner's challenge, the trial court found that petitioner had failed to make a *prima facie* case. The United States Supreme Court made clear that a *prima facie* case of discrimination can be made out by offering a wide variety of evidence "so long as the sum of the proffered facts gives rise to an inference of a discriminatory purpose." *Id.* The Supreme Court emphasized that it "did not intend the first step to be so onerous that a defendant would have to persuade the judge -- on the basis of all the facts, some of which are impossible for the defendant to know with certainty -- that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies *Batson*'s first step requirements by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.*

[41] *Id.*

Moreover, the trial court erred in aggregating the peremptory strikes of Grimes and Sells. Superior Court Criminal Rule 24(b) provides that "[i]n noncapital cases, the State shall be entitled to 6 peremptory challenges and the defendant or defendants shall be entitled to a total of 6 peremptory challenges."[42] Rule 24(b)(2) further provides that "[i]f there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly."[43] Here, Sells and Grimes were exercising their peremptory challenges separately.[44] In *McCoy*, this Court reiterated that "'[o]ne of the primary safeguards for impaneling a fair and impartial jury is a defendant's right to challenge prospective jurors, either peremptorily or for cause.'"[45] The importance of peremptory strikes is highlighted by our recognition that "a new trial is required when a juror is erroneously allowed to remain on the jury despite the defendant's valid peremptory challenge to that juror's presence."[46] We explained our rationale as follows:

---

[42] DEL. SUPER. CT. R. CRIM. P. 24(b).

[43] DEL. SUPER. CT. R. CRIM. P. 24(b)(2).

[44] The record presented to this Court does not show how many peremptory strikes each defendant was given. Our review of the record suggests that Grimes attempted to exercise his fourth peremptory challenge and Sells' attempted to exercise his fifth peremptory challenge to remove Juror #8.

[45] *McCoy*, 2015 WL 292575, at *31 (quoting *Schwan v. State*, 65 A.3d 582, 587 (Del. 2013); *Banther v. State*, 823 A.2d 467, 482 (Del. 2003)).

[46] *McCoy*, 2015 WL 292575, at *32.

In *Riley v. State*, this Court held that "peremptory challenges, when appropriately executed, are an essential tool for eliminating potential jury bias **and must** be available to any party, within constitutional limits." The improper denial of a peremptory challenge forces the defendant to be judged by a jury that includes a juror that is objectionable to him. When this occurs, and the defendant properly objected to seating the juror by attempting to exercise his Rule 24(c) right to use a peremptory challenge, and that objection is overruled by an erroneous finding of a reverse *Batson* violation, prejudice must be presumed.[47]

Each defendant is entitled to a fair and impartial jury. Because there is no basis in the record before us to attribute any motives Grimes may have had in exercising his strikes to Sells, it was error to conclude that Sells was engaging in a pattern of racial discrimination in striking two white jurors and one black juror.

Further, because African Americans like Sells[48] are members of a minority group in Kent County, the pattern of peremptory strikes against only Caucasian members of the venire may provide less of an inference of discrimination. If a super-majority of the venire is Caucasian, a pattern of striking white jurors is less telling evidence that race was a factor, because the mathematical odds would be that most potential jurors questioned for the parties to strike would be Caucasian. Thus, trial courts should be cautious about inhibiting the use of peremptory strikes

---

[47] *Id.* (quoting *Riley v. State*, 496 A.2d 997, 1012 (Del. 1985) (emphasis added)) (citing DEL. CONST. art. I § 4; DEL. SUPER. CT. CRIM. R. 24(c); *State v. Mootz*, 808 N.W.2d 207, 225 (Iowa 2012)).

[48] Sells notes in his brief that he is of "mixed race, both Caucasian and African-American." Thus, Sells contends that regardless of whether he was removing an African American juror or a Caucasian juror, he was removing a juror of his race. This argument, however, was not presented to the trial court.

by a defendant except after careful application of *Batson*.  Because here there was an insufficient basis for the trial court's conclusion that there was a "pattern" of discrimination, prejudice must be presumed and a new trial is required.

After finding that a *prima facie* case of impermissible discrimination had been established, the trial court proceeded to the second step of the *Batson* analysis.  It then found that Sells had not articulated a "non-discriminatory" reason for attempting to remove Juror #8 since Sells' proffered reason turned out to be erroneous.[49]

Sells argues that the challenge to Juror #8 was based on a valid race-neutral reason because Juror #8 was employed by "law enforcement."  We have held that to rebut the *prima facia* case, "the [proponent of the strike] must provide a 'clear and reasonably specific' explanation of 'legitimate reasons' for his use of the challenges that are 'related to the particular case.'"[50]

As the Superior Court explained, Juror #8 was actually employed by the Levy Court as a mechanic.[51]  The court noted that Juror #8 was a mechanic; but the form the juror submitted also indicated that he was a member of law enforcement.

---

[49] The third step in the analysis -- whether the opponent of the strike has made a record that would support a finding of pretext -- was not reached.

[50] *Dixon v. State*, 673 A.2d 1220, 1224 (Del. 1996) (quoting *Batson v. Kentucky*, 476 U.S. 79, 98 n.20 (1986)); *see also Jones v. State*, 938 A.2d 626, 632 (Del. 2007).

[51] *See* App. to Opening Br. at A28-30 ("[State]:  Your Honor, and just for the record, while [Juror #8] does indicate that he's employed in Kent County Levy Court, his occupation is a mechanic.").

Regardless of this discrepancy, because the State never established a *prima facie* case for a reverse-*Batson* violation, it was error for the trial court to shift the burden to Sells to articulate a legitimate non-discriminatory reason for exercising his peremptory challenge. As a result, Juror #8 was improperly seated and participated in the trial.[52] Accordingly, we reverse and remand to the Superior Court for a new trial.

## III.   CONCLUSION

Based upon the forgoing, the judgment of the Superior Court is hereby REVERSED and REMANDED.

---

[52] As it turns out, Juror #8 was removed after jury deliberations had begun because he had an *ex parte* conversation with a State witness prior to the commencement of deliberations. Sells and Grimes consented to the removal of Juror #8. The trial proceeded with a jury of eleven. In *Claudio v. State*, we acknowledged that with the consent of the parties, the unanimous verdict of eleven jurors could be accepted by the court. *Claudio v. State*, 585 A.2d 1278, 1304 (Del. 1991). While, as a result of an on-the-record colloquy, Sells appears to have waived any challenges arising from Juror #8's *ex parte* conversation with a State's witness, Sells did not waive his *Batson* challenge, and the subsequent removal of Juror #8 does not "cure" the improper seating of Juror #8.